## NEW YORK STATE CONFERENCE OF BLUE CROSS & BLUE SHIELD PLANS ET AL. *v.* TRAVELERS INSURANCE CO. ET AL.

No. 93–1408.   Argued January 18, 1995—Decided April 26, 1995*

---

*Together with No. 93–1414, *Pataki, Governor of New York, et al.* v. *Travelers Insurance Co. et al.*, and No. 93–1415, *Hospital Association of New York State* v. *Travelers Insurance Co. et al.*, also on certiorari to the same court.

646

SOUTER, J., delivered the opinion for a unanimous Court.

*M. Patricia Smith,* Assistant Attorney General of New York, argued the cause for petitioners in all cases. With her on the briefs for petitioners in No. 93–1414 were *G. Oliver Koppell,* Attorney General, *Jerry Boone,* Solicitor General, *Peter H. Schiff* and *Andrea Green,* Deputy Solicitors General, and *Jane Lauer Barker,* Assistant Attorney General. *Robert A. Bicks, Patricia Anne Kuhn, Alan C. Drewsen, Jeffrey D. Chansler, Bartley J. Costello III, Eileen M. Considine,* and *Beverly Cohen* filed briefs for petitioners in No. 93–1408. *Jeffrey J. Sherrin, Philip Rosenberg,* and *H. Bartow Farr III* filed briefs for petitioner in No. 93–1415.

*Deputy Solicitor General Kneedler* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Solicitor General Days, James A. Feldman, Allen H. Feldman, Nathaniel I. Spiller,* and *Judith D. Heimlich.*

*Craig P. Murphy* argued the cause for respondents Travelers Insurance Co. et al. in all cases. With him on the brief were *Darrell M. Joseph, Stephen M. Shapiro, Kenneth S.*

Geller, Andrew J. Pincus, Charles Rothfeld, Donald M. Falk, Zoë Baird, Theresa L. Sorota, Philip E. Stano, and Raymond A. d'Amico. Harold N. Iselin argued the cause for respondents New York State Health Maintenance Organization Conference et al. in all cases. With him on the brief were *Wendy L. Ravitz* and *Glen D. Nager.*†

---

† Briefs of *amici curiae* urging reversal were filed for the State of Minnesota et al. by *Hubert H. Humphrey III*, Attorney General of Minnesota, and *Richard S. Slowes*, Assistant Attorney General, *Richard Blumenthal*, Attorney General of Connecticut, and *Phyllis E. Hyman*, Assistant Attorney General, *J. Joseph Curran, Jr.*, Attorney General of Maryland, and *Stanley Lustman* and *Elizabeth M. Kameen*, Assistant Attorneys General, *Roland W. Burris*, Attorney General of Illinois, *Pamela Carter*, Attorney General of Indiana, *Scott Harshbarger*, Attorney General of Massachusetts, *Jeremiah W. (Jay) Nixon*, Attorney General of Missouri, *Joseph P. Mazurek*, Attorney General of Montana, *Ernest D. Preate, Jr.*, Attorney General of Pennsylvania, *Dan Morales*, Attorney General of Texas, *Darrell V. McGraw, Jr.*, Attorney General of West Virginia, and *Joseph B. Meyer*, Attorney General of Wyoming; for the American Federation of State County and Municipal Employees, AFL–CIO, by *Larry P. Weinberg, John C. Dempsey, Robert M. Weinberg, Ian D. Lanoff*, and *Andrew D. Roth;* for the American Hospital Association et al. by *Peter F. Nadel, Margaret J. Hardy, William T. McGrail*, and *Dorothy Grandolfi Wagg;* and for the National Governors' Association et al. by *Richard Ruda* and *Lee Fennell.*

Briefs of *amici curiae* urging affirmance were filed for the Association of Private Pension and Welfare Plans et al. by *Edward R. Mackiewicz;* for Group Health Association of America, Inc., by *Alan J. Davis* and *Brian D. Pedrow;* for the Federation of American Health Systems by *Carl Weissburg* and *Robert E. Goldstein;* for the National Carriers' Conference Committee by *Benjamin W. Boley, David P. Lee*, and *William H. Dempsey;* for the National Coordinating Committee for Multiemployer Plans by *Gerald M. Feder* and *Diana L. S. Peters;* for the NYSA–ILA Welfare Fund et al. by *C. Peter Lambos, Donato Caruso, Thomas W. Gleason, Ernest L. Mathews, Jr.*, and *Kevin Marrinan;* and for the Trustees of and the Pension Hospitalization Benefit Plan of the Electrical Industry et al. by *Edward J. Groarke.*

Briefs of *amici curiae* were filed for the International Foundation of Employee Benefit Plans by *Paul J. Ondrasik, Jr.*, and *Sara E. Hauptfuehrer;* and for the Self-Insurance Institute of America, Inc., by *George J. Pantos.*

JUSTICE SOUTER delivered the opinion of the Court.

A New York statute requires hospitals to collect surcharges from patients covered by a commercial insurer but not from patients insured by a Blue Cross/Blue Shield plan, and it subjects certain health maintenance organizations (HMO's) to surcharges that vary with the number of Medicaid recipients each enrolls. N. Y. Pub. Health Law § 2807–c (McKinney 1993). These cases call for us to decide whether the Employee Retirement Income Security Act of 1974 (ERISA), 88 Stat. 829, as amended, 29 U. S. C. § 1001 *et seq.* (1988 ed. and Supp. V), pre-empts the state provisions for surcharges on bills of patients whose commercial insurance coverage is purchased by employee health-care plans governed by ERISA, and for surcharges on HMO's insofar as their membership fees are paid by an ERISA plan. We hold that the provisions for surcharges do not "relate to" employee benefit plans within the meaning of ERISA's pre-emption provision, § 514(a), 29 U. S. C. § 1144(a), and accordingly suffer no pre-emption.

## I

### A

New York's Prospective Hospital Reimbursement Methodology (NYPHRM) regulates hospital rates for all in-patient care, except for services provided to Medicare beneficiaries.[1] N. Y. Pub. Health Law § 2807–c (McKinney 1993).[2] The scheme calls for patients to be charged not for the cost of their individual treatment, but for the average cost of treating the patient's medical problem, as classified under one or another of 794 Diagnostic Related Groups (DRG's). The

---

[1] Medicare rates are set by the Federal Government unless States obtain an express authorization from the United States Department of Health and Human Services. See 42 U. S. C. § 1395 *et seq.;* see also Part II–D, *infra.*

[2] References are made to the laws of New York as they stood at the times relevant to this litigation.

charges allowable in accordance with DRG classifications are adjusted for a specific hospital to reflect its particular operating costs, capital investments, bad debts, costs of charity care, and the like.

Patients with Blue Cross/Blue Shield coverage, Medicaid patients, and HMO participants are billed at a hospital's DRG rate. N. Y. Pub. Health Law § 2807–c(1)(a); see also Brief for Petitioners Pataki et al. 4.[3] Others, however, are not. Patients served by commercial insurers providing in-patient hospital coverage on an expense-incurred basis, by self-insured funds directly reimbursing hospitals, and by certain workers' compensation, volunteer firefighters' benefit, ambulance workers' benefit, and no-fault motor vehicle insurance funds, must be billed at the DRG rate plus a 13% surcharge to be retained by the hospital. N. Y. Pub. Health Law § 2807–c(1)(b). For the year ending March 31, 1993, moreover, hospitals were required to bill commercially insured patients for a further 11% surcharge to be turned over to the State, with the result that these patients were charged 24% more than the DRG rate. § 2807–c(11)(i).

New York law also imposes a surcharge on HMO's, which varies depending on the number of eligible Medicaid recipients an HMO has enrolled, but which may run as high as 9% of the aggregate monthly charges paid by an HMO for its members' in-patient hospital care. §§ 2807–c(2–a)(a) to (2–a)(e). This assessment is not an increase in the rates to be paid by an HMO to hospitals, but a direct payment by the HMO to the State's general fund.

## B

ERISA's comprehensive regulation of employee welfare and pension benefit plans extends to those that provide "medical, surgical, or hospital care or benefits" for plan par-

---

[3] Under certain circumstances, New York law permits HMO's to negotiate their own hospital payment schedules subject to state approval. § 2807–c(2)(b)(i).

ticipants or their beneficiaries "through the purchase of insurance or otherwise." §3(1), 29 U. S. C. §1002(1). The federal statute does not go about protecting plan participants and their beneficiaries by requiring employers to provide any given set of minimum benefits, but instead controls the administration of benefit plans, see §2, 29 U. S. C. §1001(b), as by imposing reporting and disclosure mandates, §§101–111, 29 U. S. C. §§1021–1031, participation and vesting requirements, §§201–211, 29 U. S. C. §§1051–1061, funding standards, §§301–308, 29 U. S. C. §§1081–1086, and fiduciary responsibilities for plan administrators, §§401–414, 29 U. S. C. §§1101–1114. It envisions administrative oversight, imposes criminal sanctions, and establishes a comprehensive civil enforcement scheme. §§501–515, 29 U. S. C. §§1131–1145. It also pre-empts some state law. §514, 29 U. S. C. §1144.

Section 514(a) provides that ERISA "shall supersede any and all State laws insofar as they . . . relate to any employee benefit plan" covered by the statute, 29 U. S. C. §1144(a), although pre-emption stops short of "any law of any State which regulates insurance." §514(b)(2)(A), 29 U. S. C. §1144(b)(2)(A). (This exception for insurance regulation is itself limited, however, by the provision that an employee welfare benefit plan may not "be deemed to be an insurance company or other insurer . . . or to be engaged in the business of insurance . . . ." §514(b)(2)(B), 29 U. S. C. §1144(b)(2)(B).) Finally, ERISA saves from pre-emption "any generally applicable criminal law of a State." §514(b)(4), 29 U. S. C. §1144(b)(4).

## C

On the claimed authority of ERISA's general pre-emption provision, several commercial insurers, acting as fiduciaries of ERISA plans they administer, joined with their trade associations to bring actions against state officials in United States District Court seeking to invalidate the 13%, 11%, and

9% surcharge statutes. The New York State Conference of Blue Cross and Blue Shield plans, Empire Blue Cross and Blue Shield (collectively the Blues), and the Hospital Association of New York State intervened as defendants, and the New York State Health Maintenance Organization Conference and several HMO's intervened as plaintiffs. The District Court consolidated the actions and granted summary judgment to the plaintiffs. *Travelers Ins. Co.* v. *Cuomo,* 813 F. Supp. 996 (SDNY 1993). The court found that although the surcharges "do not directly increase a plan's costs or [a]ffect the level of benefits to be offered" there could be "little doubt that the [s]urcharges at issue will have a significant effect on the commercial insurers and HMOs which do or could provide coverage for ERISA plans and thus lead, at least indirectly, to an increase in plan costs." *Id.,* at 1003 (footnote omitted). It found that the "entire justification for the [s]urcharges is premised on that exact result—that the [s]urcharges will increase the cost of obtaining medical insurance through any source other than the Blues to a sufficient extent that customers will switch their coverage to and ensure the economic viability of the Blues." *Ibid.* (footnote omitted). The District Court concluded that this effect on choices by ERISA plans was enough to trigger pre-emption under § 514(a) and that the surcharges were not saved by § 514(b) as regulating insurance. *Id.,* at 1003–1008. The District Court accordingly enjoined enforcement of "those surcharges against any commercial insurers or HMOs in connection with their coverage of . . . ERISA plans." *Id.,* at 1012.[4]

---

[4] The District Court and the Court of Appeals both held that the injunctive remedy was not prohibited by the Tax Injunction Act, 28 U. S. C. § 1341, which provides that federal district courts "shall not enjoin, suspend or restrain the assessment . . . of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State." Although these courts considered the surcharges to be taxes, they found no "plain, speedy and efficient remedy" to exist in state court, since ERISA § 502(e), 29 U. S. C. § 1132(e)(1) (1988 ed., Supp. V), divests state courts of jurisdiction over such claims. See 813 F. Supp., at 1000–1001;

The Court of Appeals for the Second Circuit affirmed, relying on our decisions in *Shaw* v. *Delta Air Lines, Inc.*, 463 U. S. 85 (1983), and *District of Columbia* v. *Greater Washington Bd. of Trade*, 506 U. S. 125 (1992), holding that ERISA's pre-emption clause must be read broadly to reach any state law having a connection with, or reference to, covered employee benefit plans. *Travelers Ins. Co.* v. *Cuomo*, 14 F. 3d 708, 718 (1994). In the light of our decision in *Ingersoll-Rand Co.* v. *McClendon*, 498 U. S. 133, 141 (1990), the Court of Appeals abandoned its own prior decision in *Rebaldo* v. *Cuomo*, 749 F. 2d 133, 137 (1984), cert. denied, 472 U. S. 1008 (1985), which had drawn upon the definition of the term "State" in ERISA § 514(c)(2), 29 U. S. C. § 1144(c)(2), to conclude that "a state law must 'purpor[t] to regulate . . . the terms and conditions of employee benefit plans' to fall within the preemption provision" of ERISA. 14 F. 3d, at 719 (internal quotation marks omitted). Rejecting that narrower approach to ERISA pre-emption, it relied on our statement in *Ingersoll-Rand* that under the applicable "'broad common-sense meaning,' a state law may 'relate to' a benefit plan, and thereby be pre-empted, even if the law is not specifically designed to affect such plans, or the effect is only indirect." 498 U. S., at 139; see 14 F. 3d, at 718.

*Travelers Ins. Co.* v. *Cuomo*, 14 F. 3d 708, 713–714 (CA2 1994). Neither party challenges this conclusion and we have no occasion to examine it.

Nor do we address the surcharge statute insofar as it applies to self-insured funds. The trial court's ERISA analysis originally led it to enjoin defendants "from enforcing those surcharges against any commercial insurers or HMOs in connection with their coverage of . . . ERISA plans," without any further mention of self-insured funds. 813 F. Supp., at 1012. After staying its decision as to the 13% surcharge pending appeal, see *id.*, at 1012–1015, it ordered all named parties, including the Travelers Insurance Company (which served as fiduciary to a self-insured plan), to pay that surcharge whenever required by state law, see *Travelers Ins. Co.* v. *New York State Health Maintenance Conference*, No. 92 Civ. 3999 (SDNY Apr. 27, 1993), reprinted in Brief for National Carriers' Conference Committee as *Amicus Curiae* 29a–31a. The Court of Appeals, in turn, did not expressly address this application of the surcharge and, accordingly, we leave it for consideration on remand.

The Court of Appeals agreed with the trial court that the surcharges were meant to increase the costs of certain insurance and health care by HMO's, and held that this "purpose-[ful] interfer[ence] with the choices that ERISA plans make for health care coverage . . . is sufficient to constitute [a] 'connection with' ERISA plans" triggering pre-emption. *Id.*, at 719. The court's conclusion, in sum, was that "the three surcharges 'relate to' ERISA because they impose a significant economic burden on commercial insurers and HMOs" and therefore "have an impermissible impact on ERISA plan structure and administration." *Id.*, at 721. In the light of its conclusion that the surcharge statutes were not otherwise saved by any applicable exception, the court held them pre-empted. *Id.*, at 723. It recognized the apparent conflict between its conclusion and the decision of the Third Circuit in *United Wire, Metal and Machine Health and Welfare Fund* v. *Morristown Memorial Hosp.*, 995 F. 2d 1179, 1191, cert. denied, 510 U. S. 944 (1993), which held that New Jersey's similar ratesetting statute "does not relate to the plans in a way that triggers ERISA's preemption clause." See 14 F. 3d, at 721, n. 3. We granted certiorari to resolve this conflict, 513 U. S. 920 (1994), and now reverse and remand.

## II

Our past cases have recognized that the Supremacy Clause, U. S. Const., Art. VI, may entail pre-emption of state law either by express provision, by implication, or by a conflict between federal and state law. See *Pacific Gas & Elec. Co.* v. *State Energy Resources Conservation and Development Comm'n*, 461 U. S. 190, 203–204 (1983); *Rice* v. *Santa Fe Elevator Corp.*, 331 U. S. 218, 230 (1947). And yet, despite the variety of these opportunities for federal preeminence, we have never assumed lightly that Congress has derogated state regulation, but instead have addressed claims of pre-emption with the starting presumption that Congress does not intend to supplant state law. See *Maryland* v.

*Louisiana,* 451 U. S. 725, 746 (1981). Indeed, in cases like this one, where federal law is said to bar state action in fields of traditional state regulation, see *Hillsborough County* v. *Automated Medical Laboratories, Inc.,* 471 U. S. 707, 719 (1985), we have worked on the "assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Rice, supra,* at 230. See, *e. g., Cipollone* v. *Liggett Group, Inc.,* 505 U. S. 504, 516 (1992); *id.,* at 532–533 (Blackmun, J., concurring in part, concurring in judgment in part, and dissenting in part); *Metropolitan Life Ins. Co.* v. *Massachusetts,* 471 U. S. 724, 740 (1985); *Jones* v. *Rath Packing Co.,* 430 U. S. 519 (1977); *Napier* v. *Atlantic Coast Line R. Co.,* 272 U. S. 605, 611 (1926).

Since pre-emption claims turn on Congress's intent, *Cipollone, supra,* at 516; *Shaw, supra,* at 95, we begin as we do in any exercise of statutory construction with the text of the provision in question, and move on, as need be, to the structure and purpose of the Act in which it occurs. See, *e. g., Ingersoll-Rand, supra,* at 138. The governing text of ERISA is clearly expansive. Section 514(a) marks for pre-emption "all state laws insofar as they . . . relate to any employee benefit plan" covered by ERISA, and one might be excused for wondering, at first blush, whether the words of limitation ("insofar as they . . . relate") do much limiting. If "relate to" were taken to extend to the furthest stretch of its indeterminacy, then for all practical purposes pre-emption would never run its course, for "[r]eally, universally, relations stop nowhere," H. James, Roderick Hudson xli (New York ed., World's Classics 1980). But that, of course, would be to read Congress's words of limitation as mere sham, and to read the presumption against pre-emption out of the law whenever Congress speaks to the matter with generality. That said, we have to recognize that our prior attempt to construe the phrase "relate to" does not give us much help drawing the line here.

In *Shaw*, we explained that "[a] law 'relates to' an employee benefit plan, in the normal sense of the phrase, if it has a connection with or reference to such a plan." 463 U. S., at 96–97. The latter alternative, at least, can be ruled out. The surcharges are imposed upon patients and HMO's, regardless of whether the commercial coverage or membership, respectively, is ultimately secured by an ERISA plan, private purchase, or otherwise, with the consequence that the surcharge statutes cannot be said to make "reference to" ERISA plans in any manner. Cf. *Greater Washington Bd. of Trade*, 506 U. S., at 130 (striking down District of Columbia law that "specifically refers to welfare benefit plans regulated by ERISA and on that basis alone is pre-empted"). But this still leaves us to question whether the surcharge laws have a "connection with" the ERISA plans, and here an uncritical literalism is no more help than in trying to construe "relate to." For the same reasons that infinite relations cannot be the measure of pre-emption, neither can infinite connections. We simply must go beyond the unhelpful text and the frustrating difficulty of defining its key term, and look instead to the objectives of the ERISA statute as a guide to the scope of the state law that Congress understood would survive.

### A

As we have said before, § 514 indicates Congress's intent to establish the regulation of employee welfare benefit plans "as exclusively a federal concern." *Alessi* v. *Raybestos-Manhattan, Inc.*, 451 U. S. 504, 523 (1981). We have found that in passing § 514(a), Congress intended

> "to ensure that plans and plan sponsors would be subject to a uniform body of benefits law; the goal was to minimize the administrative and financial burden of complying with conflicting directives among States or between States and the Federal Government . . . , [and to prevent] the potential for conflict in substantive law . . . requiring

the tailoring of plans and employer conduct to the peculiarities of the law of each jurisdiction." *Ingersoll-Rand*, 498 U. S., at 142.

This objective was described in the House of Representatives by a sponsor of the Act, Representative Dent, as being to "eliminat[e] the threat of conflicting and inconsistent State and local regulation." 120 Cong. Rec. 29197 (1974). Senator Williams made the same point, that "with the narrow exceptions specified in the bill, the substantive and enforcement provisions . . . are intended to preempt the field for Federal regulations, thus eliminating the threat of conflicting or inconsistent State and local regulation of employee benefit plans." *Id.*, at 29933. The basic thrust of the pre-emption clause, then, was to avoid a multiplicity of regulation in order to permit the nationally uniform administration of employee benefit plans.

Accordingly in *Shaw*, for example, we had no trouble finding that New York's "Human Rights Law, which prohibit[ed] employers from structuring their employee benefit plans in a manner that discriminate[d] on the basis of pregnancy, and [New York's] Disability Benefits Law, which require[d] employers to pay employees specific benefits, clearly 'relate[d] to' benefit plans." 463 U. S., at 97. These mandates affecting coverage could have been honored only by varying the subjects of a plan's benefits whenever New York law might have applied, or by requiring every plan to provide all beneficiaries with a benefit demanded by New York law if New York law could have been said to require it for any one beneficiary. Similarly, Pennsylvania's law that prohibited "plans from . . . requiring reimbursement [from the beneficiary] in the event of recovery from a third party" related to employee benefit plans within the meaning of § 514(a). *FMC Corp.* v. *Holliday*, 498 U. S. 52, 60 (1990). The law "prohibit[ed] plans from being structured in a manner requiring reimbursement in the event of recovery from a third party" and "require[d] plan providers to calculate benefit levels in

Pennsylvania based on expected liability conditions that differ from those in States that have not enacted similar anti-subrogation legislation," thereby "frustrat[ing] plan administrators' continuing obligation to calculate uniform benefit levels nationwide." *Ibid.* Pennsylvania employees who recovered in negligence actions against tortfeasors would, by virtue of the state law, in effect have been entitled to benefits in excess of what plan administrators intended to provide, and in excess of what the plan provided to employees in other States. Along the same lines, New Jersey could not prohibit plans from setting workers' compensation payments off against employees' retirement benefits or pensions, because doing so would prevent plans from using a method of calculating benefits permitted by federal law. *Alessi, supra,* at 524. In each of these cases, ERISA pre-empted state laws that mandated employee benefit structures or their administration. Elsewhere, we have held that state laws providing alternative enforcement mechanisms also relate to ERISA plans, triggering pre-emption. See *Ingersoll-Rand, supra.*

## B

Both the purpose and the effects of the New York surcharge statute distinguish it from the examples just given. The charge differentials have been justified on the ground that the Blues pay the hospitals promptly and efficiently and, more importantly, provide coverage for many subscribers whom the commercial insurers would reject as unacceptable risks. The Blues' practice, called open enrollment, has consistently been cited as the principal reason for charge differentials, whether the differentials resulted from voluntary negotiation between hospitals and payers as was the case prior to the NYPHRM system, or were created by the surcharges as is the case now. See, *e. g.,* Charge Differential Analysis Committee, New York State Hospital Review and Planning Council, Report (1989), reprinted in Joint Appendix in No. 93-7132 (CA2), pp. 702, 705, 706 (J. A. CA2); J. Corcoran,

Superintendent of Insurance, Update of 1984 Position Paper of The New York State Insurance Department on Inpatient Reimbursement Rate Differential Provided Non-Profit Insurers 6–7 (1988) (J. A. CA2, at 699–700); R. Trussell, Prepayment for Hospital Care In New York State 170 (1958) (J. A. CA2, at 664) (Trussell); Thorpe, Does All-Payer Rate Setting Work? The Case of the New York Prospective Hospital Reimbursement Methodology, 12 J. Health Politics, Policy, & Law 391, 402 (1987).[5] Since the surcharges are presumably passed on at least in part to those who purchase commercial insurance or HMO membership, their effects follow from their purpose. Although there is no evidence that the surcharges will drive every health insurance consumer to the Blues, they do make the Blues more attractive (or less unattractive) as insurance alternatives and thus have an indirect economic effect on choices made by insurance buyers, including ERISA plans.

An indirect economic influence, however, does not bind plan administrators to any particular choice and thus function as a regulation of an ERISA plan itself; commercial insurers and HMO's may still offer more attractive packages

---

[5] Although respondents argue that the surcharges have become superfluous now that all insurers have become subject to certain open enrollment requirements, see Brief for Respondents Travelers Insurance Co. et al. 6–7, n. 5; 1992 N. Y. Laws, ch. 501, §4 (effective Apr. 1, 1993), N. Y. Ins. Law §3231 (McKinney Supp. 1995), it is not our responsibility to review the continuing substantive rationale for the surcharges. Even so, the surcharges may well find support in an effort to compensate the Blues for the current makeup of their insurance pool, which presumably continues to reflect their longer history of open enrollment policies. See J. Corcoran, Superintendent of Insurance, Position Paper of New York State Insurance Department on Inpatient Reimbursement Rate Differential Provided Non-Profit Insurers 8 (1984) (J. A. CA2, at 679) ("If there is any possibility of an abrupt abandonment of the current hospital discount, consideration should be given to the past history of health insurance enrollment in New York which has left the Blue Cross/Blue Shield Plans with a core of uninsurables obtained over the years and the ongoing liability resulting from that enrollment").

than the Blues. Nor does the indirect influence of the surcharges preclude uniform administrative practice or the provision of a uniform interstate benefit package if a plan wishes to provide one. It simply bears on the costs of benefits and the relative costs of competing insurance to provide them. It is an influence that can affect a plan's shopping decisions, but it does not affect the fact that any plan will shop for the best deal it can get, surcharges or no surcharges.

There is, indeed, nothing remarkable about surcharges on hospital bills, or their effects on overall cost to the plans and the relative attractiveness of certain insurers. Rate variations among hospital providers are accepted examples of cost variation, since hospitals have traditionally "attempted to compensate for their financial shortfalls by adjusting their price . . . schedules for patients with commercial health insurance." Thorpe, 12 J. Health Politics, Policy, & Law, at 394. Charge differentials for commercial insurers, even prior to state regulation, "varied dramatically across regions, ranging from 13 to 36 percent," presumably reflecting the geographically disparate burdens of providing for the uninsured. *Id.*, at 400; see *id.*, at 398–399; see also, *e. g.*, Trussell 170 (J. A. CA2, at 664); Bobinski, Unhealthy Federalism: Barriers to Increasing Health Care Access for the Uninsured, 24 U. C. D. L. Rev. 255, 267, and n. 44 (1990).

If the common character of rate differentials even in the absence of state action renders it unlikely that ERISA preemption was meant to bar such indirect economic influences under state law, the existence of other common state action with indirect economic effects on a plan's costs leaves the intent to pre-empt even less likely. Quality standards, for example, set by the State in one subject area of hospital services but not another would affect the relative cost of providing those services over others and, so, of providing different packages of health insurance benefits. Even basic regulation of employment conditions will invariably affect the cost and price of services.

Quality control and workplace regulation, to be sure, are presumably less likely to affect premium differentials among competing insurers, but that does not change the fact that such state regulation will indirectly affect what an ERISA or other plan can afford or get for its money. Thus, in the absence of a more exact guide to intended pre-emption than § 514, it is fair to conclude that mandates for rate differentials would not be pre-empted unless other regulation with indirect effects on plan costs would be superseded as well. The bigger the package of regulation with indirect effects that would fall on the respondents' reading of § 514, the less likely it is that federal regulation of benefit plans was intended to eliminate state regulation of health care costs.

Indeed, to read the pre-emption provision as displacing all state laws affecting costs and charges on the theory that they indirectly relate to ERISA plans that purchase insurance policies or HMO memberships that would cover such services would effectively read the limiting language in § 514(a) out of the statute, a conclusion that would violate basic principles of statutory interpretation and could not be squared with our prior pronouncement that "[p]re-emption does not occur . . . if the state law has only a tenuous, remote, or peripheral connection with covered plans, as is the case with many laws of general applicability." *District of Columbia* v. *Greater Washington Bd. of Trade*, 506 U. S., at 130, n. 1 (internal quotation marks and citations omitted). While Congress's extension of pre-emption to all "state laws relating to benefit plans" was meant to sweep more broadly than "state laws dealing with the subject matters covered by ERISA[,] reporting, disclosure, fiduciary responsibility, and the like," *Shaw*, 463 U. S., at 98, and n. 19, nothing in the language of the Act or the context of its passage indicates that Congress chose to displace general health care regulation, which historically has been a matter of local concern, see *Hillsborough County* v. *Automated Medical Laboratories, Inc.*, 471 U. S., at 719; 1 B. Furrow, T. Greaney,

S. Johnson, T. Jost, & R. Schwartz, Health Law §§ 1–6, 1–23 (1995).

In sum, cost uniformity was almost certainly not an object of pre-emption, just as laws with only an indirect economic effect on the relative costs of various health insurance packages in a given State are a far cry from those "conflicting directives" from which Congress meant to insulate ERISA plans. See 498 U. S., at 142. Such state laws leave plan administrators right where they would be in any case, with the responsibility to choose the best overall coverage for the money. We therefore conclude that such state laws do not bear the requisite "connection with" ERISA plans to trigger pre-emption.

C

This conclusion is confirmed by our decision in *Mackey* v. *Lanier Collection Agency & Service, Inc.*, 486 U. S. 825 (1988), which held that ERISA pre-emption falls short of barring application of a general state garnishment statute to participants' benefits in the hands of an ERISA welfare benefit plan. We took no issue with the argument of the *Mackey* plan's trustees that garnishment would impose administrative costs and burdens upon benefit plans, *id.*, at 831, but concluded from the text and structure of ERISA's pre-emption and enforcement provisions that "Congress did not intend to forbid the use of state-law mechanisms of executing judgments against ERISA welfare benefit plans, even when those mechanisms prevent plan participants from receiving their benefits." *Id.*, at 831–832. If a law authorizing an indirect source of administrative cost is not pre-empted, it should follow that a law operating as an indirect source of merely economic influence on administrative decisions, as here, should not suffice to trigger pre-emption either.

The commercial challengers counter by invoking the earlier case of *Metropolitan Life Ins. Co.* v. *Massachusetts*, 471 U. S. 724 (1985), which considered whether a State could mandate coverage of specified minimum mental-health-care

benefits by policies insuring against hospital and surgical expenses. Because the regulated policies included those bought by employee welfare benefit plans, we recognized that the law "directly affected" such plans. *Id.*, at 732. Although we went on to hold that the law was ultimately saved from pre-emption by the insurance saving clause, §514(b)(2)(A), 29 U. S. C. §1144(b)(2)(A), respondents proffer the first steps in our decision as support for their argument that all laws affecting ERISA plans through their impact on insurance policies "relate to" such plans and are pre-empted unless expressly saved by the statute. The challengers take *Metropolitan Life* too far, however.

The Massachusetts statute applied not only to " '[a]ny blanket or general policy of insurance . . . or any policy of accident and sickness insurance' " but also to " 'any employees' health and welfare fund which provide[d] hospital expense and surgical expense benefits.' " 471 U. S., at 730, n. 11. In fact, the State did not even try to defend its law as unrelated to employee benefit plans for the purpose of §514(a). *Id.*, at 739. As a result, there was no reason to distinguish with any precision between the effects on insurers that are sufficiently connected with employee benefit plans to "relate to" the plans and those effects that are not. It was enough to address the distinction bluntly, saying on the one hand that laws like the one in *Metropolitan Life* relate to plans since they "bea[r] indirectly but substantially on all insured benefit plans, . . . requir[ing] them to purchase the mental-health benefits specified in the statute when they purchase a certain kind of common insurance policy," *ibid.*, but saying on the other that "laws that regulate only the insurer, or the way in which it may sell insurance, do not 'relate to' benefit plans," *id.*, at 741. Even this basic distinction recognizes that not all regulations that would influence the cost of insurance would relate to employee benefit plans within the meaning of §514(a). If, for example, a State were to regulate sales of insurance by commercial insurers more stringently

than sales by insurers not for profit, the relative cost of commercial insurance would rise; we would nonetheless say, following *Metropolitan Life,* that such laws "do not 'relate to' benefit plans in the first instance." *Ibid.* And on the same authority we would say the same about the basic tax exemption enjoyed by nonprofit insurers like the Blues since the days long before ERISA, see Marmor, New York's Blue Cross and Blue Shield, 1934–1990: The Complicated Politics of Nonprofit Regulation, 16 J. Health Politics, Policy, & Law 761, 769 (1991) (tracing New York Blue Cross's special tax treatment as a prepayment organization back to 1934); 1934 N. Y. Laws, ch. 595; and yet on respondents' theory the exemption would necessarily be pre-empted as affecting insurance prices and plan costs.

In any event, *Metropolitan Life* cannot carry the weight the commercial insurers would place on it. The New York surcharges do not impose the kind of substantive coverage requirement binding plan administrators that was at issue in *Metropolitan Life.* Although even in the absence of mandated coverage there might be a point at which an exorbitant tax leaving consumers with a Hobson's choice would be treated as imposing a substantive mandate, no showing has been made here that the surcharges are so prohibitive as to force all health insurance consumers to contract with the Blues. As they currently stand, the surcharges do not require plans to deal with only one insurer, or to insure against an entire category of illnesses they might otherwise choose to leave without coverage.

### D

It remains only to speak further on a point already raised, that any conclusion other than the one we draw would bar any state regulation of hospital costs. The basic DRG system (even without any surcharge), like any other interference with the hospital services market, would fall on a theory that all laws with indirect economic effects on ERISA

plans are pre-empted under § 514(a). This would be an unsettling result and all the more startling because several States, including New York, regulated hospital charges to one degree or another at the time ERISA was passed, see, *e. g.*, Cal. Ins. Code Ann. § 11505 (West 1972) (nonprofit hospitals); Colo. Rev. Stat. §§ 10–16–130, 10–17–108(2) to 108(3), 10–17–119(b) (1973); Conn. Gen. Stat. §§ 33–166, 33–172 (medical service corporations), § 33–179k (health care centers) (1975); Md. Ann. Code, Art. 43, §§ 568H, 568U, 568W (Michie Supp. 1976); Mass. Gen. Laws Ann., ch. 176A, §§ 5, 6 (West 1958), as amended by 1968 Mass. Acts, ch. 432, § 2, and 1969 Mass. Acts, ch. 874, § 1 (hospital service corporations), Mass. Gen. Laws Ann., ch. 176B, § 4 (West 1958 and Supp. 1987) (medical service corporations); Health Maintenance Organization Act, 1973 N. J. Laws, ch. 337, § 8, N. J. Stat. Ann. § 26:2J–8(b) (West Supp. 1986); N. Y. Pub. Health Law § 2807 (McKinney 1971); 1973 Wash. Laws, ch. 5, § 15, Rev. Code Wash. Ann. § 70.39.140 (West 1975). And yet there is not so much as a hint in ERISA's legislative history or anywhere else that Congress intended to squelch these state efforts.

Even more revealing is the National Health Planning and Resources Development Act of 1974 (NHPRDA), Pub. L. 93–641, 88 Stat. 2225, §§ 1–3, repealed by Pub. L. 99–660, title VII, § 701(a), 100 Stat. 3799, which was adopted by the same Congress that passed ERISA, and only months later. The NHPRDA sought to encourage and help fund state responses to growing health care costs and the widely diverging availability of health services. § 2, 88 Stat. 2226–2227; see generally *National Gerimedical Hospital and Gerontology Center* v. *Blue Cross of Kansas City*, 452 U. S. 378, 383–388 (1981). It provided for the organization and partial funding of regional "health systems agencies" responsible for gathering data as well as for planning and developing health resources in designated health service areas. 88 Stat. 2229–2242. The scheme called for designating state health planning and

development agencies in qualifying States to coordinate development of health services policy. *Id.*, at 2242–2244. These state agencies, too, would be eligible for federal funding, *id.*, at 2249, including grants "[f]or the purpose of demonstrating the effectiveness of State Agencies regulating rates for the provision of health care . . . within the State." *Ibid.* Exemption from ERISA pre-emption is nowhere mentioned as a prerequisite to the receipt of such funding; indeed, the only legal prerequisite to be eligible for rate regulation grants was "satisfactory evidence that the State Agency has under State law the authority to carry out rate regulation functions in accordance with this section . . . ." *Ibid.*

The Secretary was required to provide technical assistance to the designated agencies by promulgating "[a] uniform system for calculating rates to be charged to health insurers and other health institutions payors by health service institutions." *Id.*, at 2254. Although the NHPRDA placed substantive restrictions on the system the Secretary could establish, the subject matter (and therefore the scope of envisioned state regulation) covers the same ground that New York's surcharges tread. The Secretary's system was supposed to:

"(A) [b]e based on an all-inclusive rate for various categories of patients . . . [,]

"(B) [p]rovide that such rates reflect the true cost of providing services to each such category of patients . . . [,]

"(C) [p]rovide for an appropriate application of such system in the different types of institutions . . . [, and]

"(D) [p]rovide that differences in rates to various classes of purchasers (including health insurers, direct service payors, and other health institution payors) be based on justified and documented differences in the costs of operation of health service institutions made

possible by the actions of such purchasers." *Id.*, at 2254–2255.

The last-quoted subsection seems to envision a system very much like the one New York put in place, but the significant point in any event is that the statute's provision for comprehensive aid to state health care rate regulation is simply incompatible with pre-emption of the same by ERISA. To interpret ERISA's pre-emption provision as broadly as respondents suggest would have rendered the entire NHPRDA utterly nugatory, since it would have left States without the authority to do just what Congress was expressly trying to induce them to do by enacting the NHPRDA. Given that the NHPRDA was enacted after ERISA and by the same Congress, it just makes good sense to reject such an interpretation.[6]

---

[6] The history of Medicare regulation makes the same point, confirming that Congress never envisioned ERISA pre-emption as blocking state health care cost control, but rather meant to encourage and rely on state experimentation like New York's. See generally K. Davis, G. Anderson, D. Rowland, & E. Steinberg, Health Care Cost Containment 23–25, 81, 99 (1990). Since the time DRG systems were tried out in the 1960's and 1970's, Congress has consistently shown its awareness and encouragement of controlled payment alternatives to the federal regulatory scheme. The Social Security Amendments of 1967, Pub. L. 90–248, § 402(a), 81 Stat. 930–931, as amended 42 U. S. C. § 1395b–1, for example, granted the Secretary of Health, Education, and Welfare (now Health and Human Services) the authority to waive Medicare rules to allow for physician and hospital reimbursement according to approved state payment schedules. In the Social Security Amendments of 1972, Pub. L. 92–603, § 222(a)(5), 86 Stat. 1391, Congress specifically called upon the Secretary to report on prospective reimbursement schemes that had been thus favored already or could be in the future. Later on, after the development of all-payor ratesetting schemes like the NYPHRM and New Jersey's Health Care Cost Reduction Act of 1978, 1978 N. J. Laws, ch. 83, Congress's Medicare waiver provisions evolved to the point of explicit reference to a State's commitment to apply its hospital reimbursement control system to a substantial portion of hospitals and inpatient services statewide. See 42 U. S. C. §§ 1395ww(c)(1), (c)(5)(A). Indeed, in its Report on the Social Security Amendments of

## III

That said, we do not hold today that ERISA pre-empts only direct regulation of ERISA plans, nor could we do that with fidelity to the views expressed in our prior opinions on the matter. See, e. g., *Ingersoll-Rand*, 498 U. S., at 139; *Pilot Life Ins. Co.* v. *Dedeaux*, 481 U. S. 41, 47–48 (1987); *Shaw*, 463 U. S., at 98. We acknowledge that a state law might produce such acute, albeit indirect, economic effects, by intent or otherwise, as to force an ERISA plan to adopt a certain scheme of substantive coverage or effectively restrict its choice of insurers, and that such a state law might indeed be pre-empted under § 514. But as we have shown, New York's surcharges do not fall into either category; they affect only indirectly the relative prices of insurance policies, a result no different from myriad state laws in areas traditionally subject to local regulation, which Congress could not possibly have intended to eliminate.

The judgment of the Court of Appeals is therefore reversed, and the cases are remanded for further proceedings consistent with this opinion.

*It is so ordered.*

---

1983, the House Committee on Ways and Means recommended that States should not be held to traditional DRG-based reimbursement systems. "State systems provide a laboratory for innovative methods of controlling health care costs, and should, therefore, not be limited to one methodology." H. R. Rep. No. 98–25, pt. 1, pp. 146–147 (1983). The Committee concluded that "State systems covering all payors have proven effective in reducing health costs and should be encouraged. Such State programs may be useful models for our national system." *Id.*, at 147–148. While the history of Medicare waivers and implementing legislation enacted after ERISA itself is, of course, not conclusive proof of the congressional intent behind ERISA, the fact that Congress envisioned state experiments with comprehensive hospital reimbursement regulation supports our conclusion that ERISA was not meant to pre-empt basic rate regulation.