MICHAEL, Circuit Judge,
dissenting:
Maryland, like most states, is wrestling with explosive growth in the cost of Medicaid. Innovative ideas for solving the funding crisis are required, and the federal government, as the co-sponsor of Medicaid, has consistently called upon the states to function as laboratories for developing workable solutions. In response to this call and its own funding predicament, Maryland enacted the Fair Share Health Care Fund Act (Maryland Act or Act) in 2006 to require very large employers, such as Wal-Mart Stores, Inc., to assume greater responsibility for employee health insurance costs that are now shunted to Medicaid. I respectfully dissent from the majority’s opinion that the Maryland Act is preempted by ERISA. The Act offers a covered employer the option to pay an assessment into a state fund that will support Maryland’s Medicaid program. Thus, the Act offers a means of compliance that does not impact ERISA plans, and it is not preempted.
I.
“Medicaid is a means-tested entitlement program financed by the states and federal government” that provides medical care for about 60 million Americans, a number made up of low-income adults and their dependent children. Nat’l Governors Ass’n & Nat’l Ass’n of State Budget Officers, The Fiscal Survey of States 4 (2006). Medicaid was originally intended to provide help to the most vulnerable rather than to a broader population of the working poor and their families. In short, Congress intended for the Medicaid program to serve only as the “payer of last resort.” See S.Rep. No. 99-146, at 312-13 (1985), as reprinted in 1986 U.S.C.C.A.N. 42, 279-80. Over time, however, Medicaid has become the payer of first resort for a large percentage of patients. In 2006 state and federal Medicaid spending totaled an estimated $320 billion. Medicaid — the fastest-growing expense for many states — dominates the state budgeting process around the country. Program expenditures currently make up about twenty-two percent of total state spending annually, and these outlays are projected to grow at a rate of eight percent over the next decade. Already, between one-quarter and one-third of the states have experienced significant *199 shortfalls in their annual Medicaid appropriations, suggesting that those with lower incomes are being pushed to Medicaid at an unexpected (and alarming) rate.
The increase in Medicaid spending is caused in part by the decline in employer-sponsored health insurance. In Maryland’s words, Medicaid “has been transformed into a corporate subsidy, with taxpayer-funded employee health care an integral component of [many] an employer’s benefits program.” Reply Br. of Appellant at 4. Wal-Mart, which is subject to the Maryland Act, is cited as a company that abuses the Medicaid program. “Wal-Mart has more employees and dependents on subsidized Medicaid or similar programs than any other company nationwide.” J.A. 321. A Georgia survey “found that more than 10,000 children of Wal-Mart employees were enrolled in the state’s children’s health insurance program ... at a cost of nearly $10 million annually.” J.A. 89. Similarly, a study by a North Carolina hospital found that thirty-one percent of Wal-Mart employees were enrolled in Medicaid and an additional sixteen percent were uninsured. In an internal company memo of fairly recent origin, Wal-Mart acknowledged that “[t]wenty-seven percent of [its employees’] children are on [Medicaid],” and an additional nineteen percent are uninsured. J.A. 321.
II.
Maryland has its own Medicaid funding crisis. The state’s Medical Assistance (Medicaid and children’s health) Program now consumes about seventeen percent of the state general fund, and it is one of the fastest growing components of the budget. Maryland’s 2007 Medical Assistance expenditures are expected to total $4.7 billion. Over the next five years the state’s Medicaid costs are projected to grow at a rate that exceeds growth in general fund revenues by about three percent. Increasing enrollment in the program is a contributing factor. Enrollment growth is being spurred by the continuing rise in the number of children qualifying for Medicaid due to low family income. As employers drop or fail to offer affordable family health care coverage, more and more children of low income employees are forced into Medicaid or other taxpayer-funded insurance. Rising health care costs and the increase in the number of uninsured residents of all ages are also factors that accelerate the growth in Maryland’s Medicaid budget. Even though many of the uninsured may not qualify for Medicaid, they nevertheless drive up Medicaid costs under Maryland’s “all-payor” system. The all-payor system requires those who pay their hospital bills in Maryland to subsidize the cost of hospital care rendered to uninsured patients. The costs of treating those who cannot pay are added into the state-approved rates charged to those who can pay through insurance or other means. See Md.Code Ann. Health-Gen. §§ 19-211, 214, 219. The all-payor rates rise as the number of uninsured persons increases. Medicaid, as a significant purchaser of medical care in Maryland, is thus forced to bear an ever greater burden as the number of patients without employer-backed health insurance increases.
Maryland’s annual Medicaid obligations are exceeding legislative appropriations by enormous sums. The shortfall in 2006 was estimated to be around $130 million. The state has made up the deficit in part by transferring money from other programs. Such stopgap measures, however, are becoming less sustainable with each passing month. To deal with the crisis, Maryland, like many other states, has sought new ways to constrain health care costs and *200 generate additional revenue for its Medicaid program.
The Maryland Act is part of the state’s effort to deal with the mounting funding pressures. The Act establishes the Fair Share Health Care Fund to “support the operations of the [Maryland Medical Assistance] Program.” Md.Code Ann. Health-Gen. § 15-142(e). The fund will,receive revenue from assessments on large employers that fail to meet the Act’s spending requirements for health insurance. Id. § 15-142(e). The Act requires each employer with 10,000 or more employees in Maryland to submit an annual report specifying its Maryland employee number, the amount it spent on health insurance in Maryland, and the percentage of payroll it spent on health insurance in the state. Md.Code Ann. Lab. & Empl. § 8.5-103. Currently, four employers in Maryland are subject to the Act. A for-profit employer, of which there are three, must spend eight percent or more of total wages on health insurance or pay the difference to the Secretary of Labor, Licensing, and Regulation. Id. § 8.5-104(b). Health insurance costs include all tax deductible spending on employee health insurance or health care allowed by the Internal Revenue Code. Id. § 8.5-101(d). Nothing in the Act demonstrates an intent to restrict its application solely to Wal-Mart.
The Act instructs the Secretary to place any i*evenue collected in a special fund to defray the costs of Maryland’s Medicaid program. Md.Code Ann. Health-Gen. § 15-142. In this way, the Act will support the state’s Medical Assistance Program either by directly defraying Medicaid costs or by prompting covered employers to spend more on employee health insurance.
III.
I agree with the majority that the claims asserted by the Retail Industry Leaders Association (RILA) are justiciable, but not for all of the same reasons. RILA has associational standing to sue because it alleges that one of its members, Wal-Mart, faces the imminent injury of being forced to comply with the Act’s reporting requirements and either to pay an assessment or to increase its spending on employee health insurance. This allegation is sufficient to satisfy the injury element necessary for standing. There is thus no need to rely on RILA’s argument that the Act will injure Wal-Mart by impeding its ability to administer its employee benefit plans in a uniform fashion. The Act will not cause such an injury, as I explain later on.
My conclusion that this action is not barred by the Tax Injunction Act also rests on different reasons. The majority is wrong to characterize the Act’s stated revenue raising purpose as superficial. The Act legitimately anticipates a potential revenue stream, despite making available an alternative mode of compliance that does not generate revenue. The Act’s revenue raising component is directly connected to the regulatory purpose of assessing employers that rely disproportionately on state-subsidized programs to provide health care for their employees.
“To determine whether a particular charge is a ‘fee’ or a ‘tax,’ the general inquiry is to assess whether the charge is for revenue raising purposes, making it a ‘tax,’ or for regulatory or punitive purposes, making it a ‘fee.’ ” Valero Terrestrial Corp. v. Caffrey, 205 F.3d 130, 134 (4th Cir.2000). An assessment is more likely to be a fee than a tax if it is imposed by. an administrative agency, it is aimed at a small group rather than the public at large, and any revenue collected is placed in a special fund dedicated to the purposes of the regulation. Collins Holding Corp. *201 v. Jasper County, 123 F.3d 797, 800 (4th Cir.1997).
In this case the Act was passed by the legislature and has revenue raising potential. Other indicators suggest, however, that the Act’s assessment scheme is more in the nature of a regulatory fee than a tax. The Act applies to a very small group — only four employers. The assessment may generate revenue, but its primary purpose is punitive in nature. It assesses employers that provide substandard health benefits or none at all. Any revenue collected serves to recoup costs incurred by the state due to such behavior; collections are not deposited in the general fund. The regulatory purpose is further evidenced by the Act’s creation of a special fund administered by the Secretary of Labor, Licensing, and Regulation and dedicated to defraying the state’s Medicaid costs. These characteristics show the significant differences between the assessment imposed by the Act and a typical tax imposed on a large segment of the population and used to benefit the general public. See Valero, 205 F.3d at 135. Because the assessment is not a tax, I therefore agree with the majority’s ultimate conclusion that the Tax Injunction Act does not deprive the federal courts of jurisdiction to consider this case.
IV.
I respectfully dissent on the issue of ERISA preemption because the Act does not force a covered employer to make a choice that impacts an employee benefit plan. An employer can comply with the Act either by paying assessments into the special fund or by increasing spending on employee health insurance. The Act expresses no preference for one method of Medicaid support or the other. As a result, the Act is not preempted by ERISA.
ERISA supersedes “any and all State laws insofar as they ... relate to any employee benefit plan.” 29 U.S.C. § 1144(a). State laws “relate to” ERISA plans if they have a “connection with” or make “reference to” such plans. Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 96-97, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983). The Maryland Act does neither.
A state statute has an impermissible connection with an ERISA plan when it requires the establishment of a plan, mandates particular employee benefits, or impacts plan administration. See Fort Halifax Packing Co. v. Coyne, 482 U.S. 1, 14, 107 S.Ct. 2211, 96 L.Ed.2d 1 (1987) (state can require one-time, lump sum severance payments because they would not require the establishment or maintenance of a plan); Egelhoff v. Egelhoff, 532 U.S. 141, 147-50, 121 S.Ct. 1322, 149 L.Ed.2d 264 (2001) (state cannot automatically revoke a beneficiary designation of an ex-spouse in a plan policy); Shaw, 463 U.S. at 97, 100, 103 S.Ct. 2890 (state cannot require ERISA plans to cover pregnancy). The Act offers a compliance option that does not require an employer to maintain an ERISA plan, administer plans according to state-prescribed rules, or offer a certain level of ERISA benefits. Also, the Act does not contain an impermissible reference to ERISA plans. It allows an employer to maintain a uniform national plan, albeit at a cost. It is thus not the sort of law that Congress intended to preempt. Indeed, the Act is a legitimate response to congressional expectations that states develop creative ways to deal with the Medicaid funding problem.
A.
The Act does not compel an employer to establish or maintain an ERISA plan in order to comply with its provisions. ERISA plan expenditures are considered *202 in the calculation of an employer’s total level of health insurance spending, but this factor does not create an impermissible connection with an ERISA plan. See Burgio & Campofelice, Inc. v. N.Y. State Dep’t of Labor, 107 F.3d 1000, 1009 (2d Cir.1997); Keystone Chapter, Associated Builders & Contractors, Inc. v. Foley, 37 F.3d 945, 961 (3d Cir.1994). The Act offers a compliance option that is not predicated on the existence of an ERISA plan. Again, an employer may comply by paying an assessment into Maryland’s Fair Share Health Care Fund.
B.
The Act does not impede an employer’s ability to administer its ERISA plans under nationally uniform provisions. A problem would arise if the Act dictated a plan’s system for processing claims, paying benefits, or determining beneficiaries. See Egelhoff, 532 U.S. at 147, 150, 121 S.Ct. 1322. But the Act does none of those things. The only aspect of the Act that might impact plan administration is the requirement for reporting data about Maryland employee numbers, payroll, and ERISA plan spending. However, any burden this requirement puts on plan administration is simply too slight to trigger ERISA preemption. See Foley, 37 F.3d at 963 (requiring employers to record benefits contributions will not influence decisions about the structure of ERISA plans and so will not impede the administration of nationwide plans); see also Minn. Chapter of Associated Builders & Contractors, Inc. v. Minn. Dep’t of Labor & Industry, 866 F.Supp. 1244, 1247 (D.Minn.1993) (“The requirement of calculating [the cost of benefits] falls on the employer itself, but does not place any administrative burden on the plan. The requirements of calculating costs and keeping records may somewhat increase the cost of the benefits plans, but this incidental impact on the plans need not lead to preemption.”).
C.
The Act does not mandate a certain level of ERISA benefits. A statute that “alters the incentives, but does not dictate the choices, facing ERISA plans” is not preempted. Calif. Div. of Labor Standards Enforcement v. Dillingham Constr., N.A., Inc., 519 U.S. 316, 334, 117 S.Ct. 832, 136 L.Ed.2d 791 (1997). The ERISA preemption provision allows for uniformity of administration and coverage, but “cost uniformity was almost certainly not an object of preemption.” N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co., 514 U.S. 645, 662, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995).
Under the Act employers have the option of either paying an assessment or increasing ERISA plan health insurance. This choice is real. The assessment does not amount to an exorbitant fee that leaves a large employer with no choice but to alter its ERISA plan offerings. See id. at 664, 115 S.Ct. 1671. According to Wal-Mart estimates, the company faces, at most, a potential assessment of one percent of its Maryland payroll. Paying the assessment would thus not be a financial burden that leaves Wal-Mart with a Hob-son’s choice, that is, no real choice but to increase health insurance benefits. Wal-Mart contends that it would never choose to pay the assessment when given the option of gaining employee goodwill through increased benefits. To begin with, Wal-Mart’s bald claim that it would increase benefits appears dubious. Wal-Mart has not seen fit thus far to use comprehensive health insurance as a means of generating employee goodwill. More important, Wal-Mart’s claim that it would increase benefits rather than pay the fee is irrelevant because the choice to *203 increase benefits is not compelled by the Act. That choice would simply be a business judgment that Wal-Mart is free to make. Indeed, an employer close to the required statutory percentage, such as Wal-Mart, may find it easier to pay the assessment than to increase health insurance spending. So long as the assessment is not so high as to make its selection financially untenable, an employer may freely evaluate whether the ability to maintain current levels of health insurance spending is worth the price of the assessment.
The majority attempts to distinguish Travelers and Dillingham by contrasting the indirect regulation of ERISA plans in those cases with what it deems a direct regulation here. I disagree with the majority’s assertion that the Maryland Act directly regulates ERISA plans. “Where a legal requirement may be easily satisfied through means unconnected to ERISA plans, and only relates to ERISA plans at the election of an employer, it ‘affectfs] employee benefit plans in too tenuous, remote, or peripheral a manner to warrant a finding that the law “relates to” the plan.’ ” Foley, 37 F.3d at 960 (quoting Shaw, 463 U.S. at 100 n. 21, 103 S.Ct. 2890). Moreover, Travelers and Dillingham focused not on nebulous distinctions between direct and indirect effects, but on establishing a general rule for ERISA preemption that “look[s] both to the objectives of the ERISA statute as a guide to the scope of the state law that Congress understood would survive as well as to the nature of the effect of the state law on ERISA plans.” Dillingham, 519 U.S. at 325, 117 S.Ct. 832 (emphasis added) (quotation marks and citations omitted). The statutes in Travelers and Dillingham were permissible regulations of ERISA plans primarily because they did not mandate a particular level of benefits or impact plan administration, not because of the non-ERISA targets of the regulations. See Travelers, 514 U.S. at 664, 115 S.Ct. 1671; Dillingham, 519 U.S. at 332-33, 117 S.Ct. 832.
We must similarly focus our inquiry on any threat the Maryland Act poses to the purposes of the ERISA preemption provision rather than on hazy distinctions between direct and indirect regulations. See Travelers, 514 U.S. at 656, 115 S.Ct. 1671. Congress generally does not intend to preempt acts in traditional areas of state regulation, such as health and safety. De Buono v. NYSA-ILA Medical & Clinical Servs. Fund, 520 U.S. 806, 813-14, 117 S.Ct. 1747, 138 L.Ed.2d 21 (1997). The purpose of the Act, to relieve state Medicaid burdens and improve health care for low income residents, falls into this category. Travelers and Dillingham demonstrate that so long as the regulation impacts a traditional area of state concern, and employers are left with an effective choice that avoids ERISA implications, the regulation may stand.
Rather than fitting within the ERISA preemption target, the Maryland Act is in line with Congress’s intention that states find innovative ways to solve the Medicaid funding crisis. Congress already directs states to “take all reasonable measures to ascertain the legal liability of [and to seek reimbursement from] third parties (including health insurers ... or other parties that are, by statute, contract, or agreement, legally responsible for payment of a claim for a health care item or service) to pay for care and services available under [Medicaid].” 42 U.S.C. §§ 1396a(a)(25)(A) & (B). I recognize, of course, that the Maryland Act goes beyond this basic directive, but it is nevertheless a legitimate response to the consistent encouragement Congress has given to the states to find “novel approaches” and to “develop innovative and effective solutions” to deal with *204 the worsening Medicaid funding problem. S.Rep. No. 99-146, at 462 (1985), as reprinted in 1986 U.S.C.C.A.N. 42, 421 (remarks of Sen. Orrin G. Hatch); see also Travelers, 514 U.S. at 665, 115 S.Ct. 1671 (recognizing that Congress has “sought to encourage ... state responses to growing health care costs and the widely diverging availability of health services”).
D.
The Act also contains no impermissible reference to an ERISA plan. Such a reference occurs only when a statute explicitly refers to or relies upon the existence of an ERISA plan. District of Columbia v. Greater Wash. Bd. of Trade, 506 U.S. 125, 130, 113 S.Ct. 580, 121 L.Ed.2d 513 (1992) (statute preempted because it applied to “health insurance coverage,” which is an ERISA plan). Obligations under the Act are tied to a covered employer’s level of tax deductible health insurance spending. The Act does not make any explicit statement about ERISA plans or rely on their existence.
E.
As the record makes clear, Maryland is being buffeted by escalating Medicaid costs. The Act is a permissible response to the problem. Because a covered employer has the option to comply with the Act by paying an assessment — a means that is not connected to an ERISA plan — I would hold that the Act is not preempted.