McHugh, J.
I.Background
In essence, this is an action for medical malpractice brought by plaintiff, Elayne Nascimento, and her children, Aya and Nea Nascimento, against Eleanor Caine, M.D. and Doctor Caine’s employer, Harvard Community Health Plan, Inc. (“HCHP”). In essence, Mrs. Nascimento alleges that HCHP and Doctor Caine negligently failed to discover and treat her breast cancer and that, as a consequence, she has suffered damages of various kinds, the precise contours and dimensions of which are here irrelevant. Mrs. Nascimento’s daughters have brought claims for negligent and intentional infliction of emotional distress and for loss of parental society arising out of the underlying acts and omissions Mrs. Nascimento alleges.
HCHP now has moved for partial summary judgment claiming that Counts 2, 3, 4, 5, 8 and 12 of plaintiffs’ complaint are preempted by certain provisions of the Federal Employee Retirement and Income Security Act of 1974 ("ERISA”), 29 U.S.C. §1001 et seq.[1] Plaintiffs have countered with their own motion for summary judgment seeking a declaration that ERISA preempts none of those counts. The acting Secretary of Labor for the United States has moved for leave to file a brief, as amicus curiae, in support of plaintiffs’ position. That motion has been allowed.
II.Undisputed Facts
Many of the facts surrounding this difficult and complicated case are fiercely contested. The essential outlines of plaintiffs’ claim and the defenses, however, are undisputed. Those undisputed facts are as follows:
Mrs. Nascimento was an employee of Harvard University and a participant in a medical insurance plan Harvard University sponsored. Harvard University undertook to provide health care to Mrs. Nascimento, and to other participants in its health plan, by purchasing memberships for them in HCHP, a federally qualified HMO that is independent of Harvard University. HCHP is a “prepaid group medical practice or health maintenance organization, which is organized to provide its Members with direct health care services through HCHP Physicians, Dentists, and Nurses, at an HCHP facility.” HCHP group service agreement, Introduction.[2]
In December of 1989, Mrs. Nascimento saw Doctor Caine, her primary care physician, for examination of abnormalities in her left breast. Thereafter, Mrs. Nascimento underwent approximately three years of diagnostic examinations and treatments. In January of 1992, she underwent a left modified radial mastectomy. Ensuing pathological examinations disclosed that she had an advanced form of cancer that had spread to her lymph nodes. A short time later, she was referred to an HCHP oncologist, Doctor Sigrid Tishler and thereafter she received a course of chemotherapy.[3]
Mrs. Nascimento alleges that Doctor Caine negligently failed to diagnose and treat her cancer in timely fashion and that Doctor Caine, along with other HCHP employees, thereafter failed to provide her with bone marrow transplantation therapy she contends was medically appropriate and proper for the disease from which she was suffering. She alleges that those failures were negligent. In Counts 2,3, and 4, however, she also alleges that “(t]he decision by HCHP to deny [her] bone marrow transplantation therapy was made solely to avoid incurring the cost of such treatment.” Complaint, ¶67, 75 and 82.
Count 2 of the Complaint alleges intentional infliction of emotional distress against HCHP arising out of HCHP’s decision to deny Mrs. Nascimento bone marrow transplantation therapy. Count 3 alleges negligent infliction of emotional distress arising out of the same set of allegations. Count 4 alleges medical malpractice against HCHP arising out of the same allegations. Count 5 alleges a “breach of contract, warranties and promises” by HCHP arising out of HCHP’S alleged failure to provide Mrs. Nascimento with medical care and treatment HCHP promised in contractual documents to provide, including “the ‘prevention and early detection’ of disease and use of‘a full range of screening tests ... to detect little problems before they became bigger ones.’ ” Complaint, ¶86. Counts 8 and 12 allege loss of parental society on the part of Mrs. Nascimento’s daughters Aya and Nea as a consequence of those alleged failures.
III.Discussion
A. GENERAL
Two provisions of ERISA are at issue here. First is Section 502(a)(1)(B), 29 U.S.C. §1132(a) which, in pertinent part, provides that
[a] civil action may be brought (1) by a participant or beneficiary . .. (B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan.
Section 502(a) has been interpreted as completely preempting state claims and causes of action and providing an “exclusive federal cause of action for resolution” of disputes the section covers. Metropolitan Life Insurance Co. v. Taylor, 481 U.S. 58, 63 (1987). In explaining that conclusion, the Supreme Court stated that although “federal preemption is ordinarily a federal defense to the plaintiffs suit. . . Congress may so completely preempt a particular area that any civil complaint raising the select group of claims is necessarily federal in character.” Id. at 63-64. When §502(a) is viewed in the context of ERISA’s manifold tightly woven provisions, the Court reasoned, a Congressional desire for complete preemption becomes apparent.[4]
The second relevant provision of ERISA is §514(a) which provides that
*574 the provisions of this section . . . shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan . . .
“State laws” are defined in ERISA as including “all laws, decisions, rules, regulations, or other State action having the effect of law.” Section 514(c)(1), 29 U.S.C. §1144.
Unlike §502(a)(1)(B), §514(a) does not provide for complete preemption. Instead, §514(a) requires state law to give way when the content of that law conflicts with conflicting provisions of ERISA. See generally, e.g. Dukes v. U.S. Healthcare, Inc., 57 F.3d 350, 355 (3d Cir.), cert. denied, 116 S.Ct. 564 (1995).[5]
Neither §502 nor §514, of course, stands in lonely isolation. Instead, both are part of a comprehensive regulatory scheme designed to provide national standards for pension and benefit plans. That overall and dominant purpose was restated recently by the Supreme Court of the United States in New York State Conference of Blue Cross and Blue Shield Plans v. Travelers Insurance Co., 514 U.S. 645 (1995). There, the Court discussed the broad purposes of ERISA as well as the role the two cited sections play in advancing those purposes. With respect to the general purposes and scope of ERISA itself, the Court said that
ERISA’S comprehensive regulation of employee welfare and pension benefit plans extends to [plans] that provide “medical, surgical, or hospital care or benefits” for plan participants or their beneficiaries “through the purchase of insurance or otherwise.” . . . The federal statute . . . controls the administration of benefit plans ... by imposing reporting and disclosure mandates . . . participation and vesting requirements . . . funding standards . . . and fiduciary responsibilities for plan administrators ... It envisions administrative oversight, imposes criminal sanctions, and establishes a comprehensive civil enforcement scheme ... It also preempts some state law . . .
Id. at 650-51.
The Court went on to say that the preemption provisions were designed “to avoid a multiplicity of regulation in order to permit the national uniform administration of employee benefit plans." 514 U.S. at 657. On the specific subject of preemption, the Court stated as follows:
[W]e have never assumed lightly that Congress has derogated state regulation, but instead have addressed claims of preemption • with the starting presumption that Congress does not intend to supplant state law . . . Indeed, in cases like this one, where federal law is said to bar state action in fields of traditional state regulation ... we have worked on the “assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.”
Id. at 654-55.
B. PREEMPTION UNDER §502(a)
As stated, §502(a)(1)(B) applies to all actions brought “to recover benefits due to [a plan member] under the terms of his [or her] plan, to enforce his [or her] rights under the terms of the plan, or to clarify his [or her] rights to future benefits under the terms of the plan.” On the surface, at least, examining the text of §502(a)(1)(B)[6] does not lead one to conclude that Mrs. Nascimento’s claims in this action are preempted. Strictly speaking, she is not here seeking to recover “benefits due to [her] under the terms of [her] plan,” she does not seek “to enforce [her] rights under the terms of [her] plan” and she does not seek “to clarify [her] rights to future benefits” under those terms. Instead, she seeks to recover damages for HCHP’s alleged negligent delivery and withholding of benefits the parties agree HCHP was obliged to deliver if and to the extent that those benefits were medically necessary.
However appealing in its simplicity, the foregoing analysis glides too easily past the difficulty of applying the phrase “to enforce [her] rights under the terms of the plan” in cases like this one. Although an action for specific performance clearly is an action designed to enforce contractual rights, so too is an action for damages flowing from an alleged contractual breach. The same can be said of an action, whether labeled as one arising in tort or in contract, based on a party’s alleged failure to provide some contractual service or benefit because, in the withholding party’s opinion, that service or benefit was “too expensive” to provide. Indeed, almost any claim arising out of a treatment-related decision can be characterized in some sense as a claim designed to enforce a contractual right. Such a characterization, however, would expand the preemptive force of §502(a) so far that little would be left of state regulation in an area where state law historically has predominated.
The dilemma posed by §502(a)’s open-ended potential has been addressed by a number of courts in a number of different decisions. Two of those provide particularly helpful guidelines for determining when the statute applies and when it does not. In the first, Rice v. Panchal, 65 F.3d 637 (7th Cir. 1995), the United States Court of Appeals for the Seventh Circuit canvassed many of the earlier decisions interpreting §502(a). Summarizing its analysis of those cases, the court said as follows:
The common thread running through these cases is that complete preemption is required where a state law claim cannot be resolved without an interpretation of the contract governed by federal law. And this focus on interpretation of the contract seems well suited to the language of §502(a)(1)(B) which concerns suits to recover benefits, determine future benefits, or enforce rights “under the terms of the plan ...” Seen in this light, we believe that a *575 suit brought by an ERISA plan participant is an action to “enforce his rights under the terms of a plan” within the scope of §502(a)(1)(B) where the claim rests upon the terms of the plan or the “resolution of the [plaintiffs] state law claim . . . require[s] construing [the ERISA plan].”
Id. at 644-45.
In the second of the two cases, Dukes v. U. S. Healthcare, Inc., 57 F.3d 350 (3rd Cir. 1995), the court discussed ERISA’s impact on rights that spring from a plan and those that exist separate and apart from a plan’s content. The court’s analysis of the difference is worth quoting at some length:
The HMOs point to no plan-created right implicated by the plaintiffs’ state law medical malpractice claims. The best they can do is assert that the plaintiffs’ medical malpractice claims “attempt to define a participant’s rights under the plan.”. . . We cannot accept that characterization. The plaintiffs are not attempting to define new “rights under the terms of the plan”; instead, they are attempting to assert their already-existing rights under the generally-applicable state law of agency and tort. Inherent in the phrases “rights under the terms of the plan” and “benefits due . .. under the terms of [the] plan” is the notion that the plan participants and beneficiaries will receive something to which they would not be otherwise entitled. But patients enjoy the right to be free from medical malpractice regardless of whether or not their medical care is provided through an ERISA plan.
We recognize that the distinction between the quantiiy of benefits due under a welfare plan and the quality of those benefits will not always be clear in situations like this where the benefit contracted for is health care services rather than money to pay for such services . . .
We . . . recognize the possibility that an ERISA plan may describe a benefit in terms that can accurately be described as related to the quality of the service. Thus, for example, a plan might promise that all X-rays would be analyzed by radiologists with a prescribed level of advanced training. A plan participant whose X-ray was analyzed by a physician with less than the prescribed training might well be entitled to enforce the plan’s promise through a suit under §502(a)(l)(B) to secure a denied benefit.
Much of the HMOs’ argument in these cases is at root a contention that the employer and the HMO impliedly contracted that the health care services provided would be of acceptable quality and, accordingly, that these damage suits rest on a failure to provide services of acceptable quality . . .
[W]hile we have no doubt that all concerned expected the medical services arranged for by the HMOs to be of acceptable quality, this seems to us beside the point. The relevant inquiry is not whether there was an expectation of acceptably competent services, but rather whether there was an agreement to displace the quality standard found in the otherwise applicable law with a contract standard.
Id. at 358-59.
Rice and Dukes, and the cases they cite and analyze, suggest that complete preemption under §502(a) does not exist unless, at the very least, the plaintiffs claim and corresponding defenses are incapable of resolution without an interpretation of the terms of the ERISA plan under which the plaintiff received medical services. Counts 2, 3 and 4 of the complaint in this action simply do not contain that trigger. Yes, Mrs. Nascimento alleges that HCHP withheld bone marrow transplant therapy, not because withholding that therapy was medically indicated, but instead to save costs. Regardless of defendants’ motive or reason for acting as they did, however, the question whether withholding bone marrow transplant therapy was wrongful requires no reference whatsoever to the terms of the plan under which HCHP delivered its services. Instead, resolution of that claim simply requires a determination whether withholding that care, for whatever reason, was or was not consistent with the care that would have been rendered at the time by the average qualified practitioner practicing in the same specialty.[7] That is a determination firmly and exclusively grounded in state law. Cf., e.g., Rogers v. Okin, 478 F.Sup. 1342, 1384 (D.Mass. 1979).
Count 5 of the Complaint stands on a different footing. There, the entire thrust of Mrs. Nascimento’s claim is not that the care with which she was provided was inconsistent with “good and accepted” medical care but that the care she was given did not meet HCHP’s contractual promise of early cancer detection.[8] At bottom, therefore, Count 5 contains a claim that the HCHP agreed in its contract to replace the generally prevailing standard of care with a higher — or at least different — level of care and then failed to provide care at the agreed-upon level. That claim thus cannot be resolved without referring to and construing the terms of the plan. I therefore am of the opinion that that claim is completely preempted by §502(a).[9]
C. Section 514
Unlike §502(a), §514(a) requires state law to give way only when that law ”relate[s] to” an employee benefit plan and conflicts with federal law. Congressional use of the open-ended phrase ”relate[s] to” in §514(a) provides an “unhelpful" guide to the section’s preemptive scope. New York State Conference of Blue Cross and Blue Shield Plans v. Travelers Insurance Co., supra, 514 U.S. at 656. In some ways, after all, everything relates to everything. See id. at 655. Accordingly, the Court has held that determining the scope of preemption under §514(a) requires one to “go beyond the unhelpful text [of the statute] and the frustrating difficulty of defining its key term, and look *576 instead to the objectives of the ERISA statute as a guide to the scope of the state law that Congress understood would survive.” Id. at 656. Continuing, the Court concluded that ERISA did not preempt state laws with “only a tenuous, remote, or peripheral connection with covered plans, as is the case with many laws of general applicability.” Id. at 661. Furthermore, in the Court’s opinion, “nothing in the language of [ERISA] or the context of its passage indicates that Congress chose to displace general health care regulation, which historically has been a matter of local concern.” Id. Therefore, “various state laws in areas traditionally subject to local regulation, which Congress could not possibly have intended to eliminate, remain free from ERISA’s preemptive provisions.” Id. at 668.
The Court’s most recent discussion of §514(a)’s limited preemptive effect came earlier this year in California Division of Labor Standards Enforcement v. Dillingham Construction, N.A., Inc., 117 S. Ct. 832 (1997). At issue in that case was a California statute generally requiring contractors on public works projects to pay their employees the prevailing wage in the project’s locale. The statute contained an exemption for payment of employees who were participating in state-approved apprenticeship programs. One of the contractors involved in the action had entered a collective bargaining agreement that included an apprenticeship wage scale lower than the prevailing wage and that also provided, in essence, that those who were paid the lower wages would participate in an apprenticeship program the state had not approved. The state claimed that payment of the lower wages under those circumstances violated the state prevailing wage law and, acting through the relevant state administrative agency, issued a cease-and-desist order. Upon receipt of the order, the contractor sued to prevent the state from interfering with execution of the collective bargaining agreement. In its suit the contractor argued, inter alia, that the apprenticeship provisions of the collective bargaining agreement were covered by ERISA, that the prevailing wage law was in conflict with those provisions and that application of the prevailing wage law to employees the contract covered was preempted by §514(a).
In the District Court, the state sought and obtained summary judgment dismissing the complaint. The Ninth Circuit reversed, holding that an apprenticeship program was an “employee welfare benefit plan" under ERISA, that the state law “related to” the plan and thus that the state law was preempted by virtue of §514(a).
In the Supreme Court, all parties agreed that the apprenticeship program was a “plan” to which ERISA applied. The Court nonetheless reversed. Speaking unanimously through Justice Thomas, the Court held that a state law “relates to" an ERISA plan for purposes of §514(A) if the state law makes “reference to” or has a “connection with” such a plan. Id. at 837. Continuing, the Court held that a state law has the “forbidden” reference where it “acts immediately and exclusively upon ERISA plans ... or where the existence of [such] plans is essential to the law’s operation.” Id. at 838. In determining whether a state law has a “connection with” ERISA plans, the Court said, one must look first at ERISA’s objectives and from those determine the scope and reach of state law that Congress understood would survive ERISA’s enactment. Having done that, one must analyze the nature of the state law’s effect on ERISA plans. In carrying out that analysis, the Court said it would assume that Congress did not intend ERISA to supercede the states’ police powers in fields of traditional state regulation unless the statute and its history clearly manifested a Congressional intent to do so. Id. at 837-38.
Applying the Supreme Court’s analysis in Dillingham to Counts 2, 3 and 4,[10] it is clear at once that the common and statutory law of medical malpractice does not interact immediately and exclusively upon ERISA plans and that the existence or nonexistence of such plans has nothing whatsoever to do with how the state law of medical malpractice operates. Moreover, as stated earlier, ERISA is designed to create a uniform body of rules and standards for the multi-state operation of plans the statute governs. New York State Conference of Blue Cross and Blue Shield Plans v. Travelers Insurance Co., supra, 514 U.S. at 657. The statute contains no hint or suggestion that it was intended to displace the traditional operation of state medical malpractice laws by creating some form of a federal serum to immunize health-care providers against the state-law consequences of negligent patient care.
The cases cited by HCHP for a contrary proposition are unpersuasive. The claims in Foster v. Blue Cross & Blue Shield of Michigan, 1997 W.L. 348474 (E.D. Mich., June 23, 1997), arose out of Blue Shield’s refusal to pay for certain cancer treatment on grounds that the treatment was “experimental or investigational in nature” and was for that reason excluded under the specific language of certain riders to a policy Blue Cross had issued to plaintiffs decedent. The plaintiffs conceded that their state-law claims for breach of contract, bad-faith infliction of emotional distress, negligent misrepresentation, fraud and wrongful death were preempted by §514(a). The Court agreed with that concession because resolution of plaintiffs claims undeniably involved construction of the terms of the Blue Cross policy. Here, in contrast, and even if the HCHP policy were the “Plan,” no one contends that the terms of the HCHP plan would have excluded bone marrow transplantation therapy if Mrs. Nascimento’s physicians had concluded that that therapy was “medically necessary.” Nor does anyone contend that “medical necessity” was to be determined under some uniquely contractual standard. Instead, the primary issue the case presents is whether Mrs. *577 Nascimento’s physicians failed, for whatever reason, to provide her with medical care of the type the familiar standard of patient care required them to provide.
HCHP also places heavy reliance on Jass v. Prudential Health Care Plan, Inc., 88 F.3d 1482 (7th Cir. 1996). There, plaintiff had had knee replacement surgery and claimed that appropriate postsurgical care included a course of physical therapy. She alleged that an employee of the defendant plan determined that physical therapy was unnecessary and that the plan thus would not pay for that therapy. Plaintiff claimed that she was prematurely discharged from the hospital without the necessary rehabilitation as a consequence of the decision regarding physical therapy. Plaintiff sued the plan agent, a registered nurse, who had made the treatment decision and also sued the plan under a theory of vicarious liability.[11]
The Court of Appeals concluded that plaintiffs claim against the nurse was preempted by §502(a). The Court’s conclusion was based on three primary factors: (1) that “as a plan participant, [plaintiff] was entitled to bring suit under §502(a), (2) [her] claim against [the nurse was] in effect a claim for denial of benefits,[12] and (3) that the claim of negligence against the nurse [could not] be resolved without interpreting the benefits contract because that contract provided the benefits to which [plaintiff] was entitled.” Id. at 1489. While the first two factors may be present here, the third surely is not. Thus even if Jass embodies the appropriate framework for analyzing claims like §514(a), the case is distinguishable on its facts from the present case.
ORDER
In light of the foregoing, it is hereby ORDERED that plaintiffs motion for summary judgment and HCHP’s motion for summary judgment should be, and they hereby are ALLOWED in part and DENIED in part.
It is further ORDERED that the provisions of the Employee Retirement Income and Security Act of 1974, 29 U.S.C. §1001, et seq. preempt the claims plaintiff has asserted in Count 5 of her complaint and, to the extent that they derive from the claims in Count 5, the claims asserted in Counts 8 and 12.
It is further ORDERED that the provisions of said Act do not preempt the claims plaintiff has asserted in Counts 2, 3 or 4 of her complaint nor do they preempt the claims asserted in Counts 8 and 12 to the extent that the latter derive from the claims in Counts 2, 3 or 4.

 Initially, HCHP contended that two additional counts, 5 and 13, which simply allege that HCHP is responsible, under a theory of respondeat superior, for the acts and omissions of Doctor Caine also were preempted by ERISA. HCHP has withdrawn its contention in that regard.

 That document is attached as exhibit 6 to Plaintiffs’ Memorandum in Opposition to HCHP’s Motion for Partial Summary Judgment. No party has contested its authenticity.

 The circumstances surrounding the decision to provide Mrs. Nascimento with chemotherapy are not subject to agreement and the record does not eliminate all disputes regarding those circumstances. The complaint alleges that Doctor Tishler initially told Mrs. Nascimento that she would be an “excellent candidate" for bone marrow transplantation therapy, an aggressive means of treating breast cancer that has metastasized to the lymph nodes. Complaint, paragraphs 36 and 37. Thereafter, Mrs. Nascimento alleges. Doctor Tishler discussed Mrs. Nascimento’s condition at a “Wednesday tumor conference,” a conference held weekly at which HCHP oncologists discuss various treatment modes. As a result of the discussions at that Wednesday treatment conference, Mrs. Nascimento alleges, Doctor Tishler decided, in consultation with others at the conference, that Mrs. Nascimento was not a good candidate for bone marrow transplantation therapy and that she should be given chemotherapy instead.

 If one concludes that §502(a)(1)(B) applies to a claim brought in state court, then the doctrine of complete preemption authorizes removal of that claim, along with pendent state claims, to federal court. Metropolitan Life Insurance Co. v. Taylor, 481 U.S. 58, 65-66 (1987). The Secretary of Labor suggests that §502(a), and perhaps the doctrine of complete preemption, operates solely as a device for removing claims from state to federal court and that substantive preemption questions are always to be analyzed under §514(a), the ERISA section discussed immediately below. Brief of the Secretary at 10, n.7. There is some support in decided cases for at least the first part of the Secretary’s contention, see, e.g., Sam L. Majors Jewelers v. ABX, Inc., 117 F.3d 922, 925 (5th Cir. 1997); Musson Theatrical, Inc. v. Federal Express Corporation, 89 F.3d 1244, 1253 (6th Cir. 1996); and, as a practical matter, a conclusion that there is no preemption under §514(a) necessarily yields a conclusion that none exists under §502(a). Nevertheless, I am of the opinion that the Secretary is in error and that application of §502(a) has an impact on claims the section governs whether the action proceeds in state or in federal court. First of all, ERISA explicitly provides that both state and federal courts have concurrent jurisdiction to hear “completely preempted” claims arising under §502(a)(1)(B). ERISA §502(e)(1), 29 U.S.C. §1132(e)(1). Second, the cases providing support for the Secretary’s contention do so on the basis of the Supreme Court’s discussion in Metropolitan Life Insurance Co. v. Taylor, supra But the only issue before the Court in Metropolitan Life was whether §502(a), and the doctrine of complete preemption, produced a federal question that supported removal to a federal court even if the asserted federal question did not appear in the well-pleaded allegations of the complaint. Indeed, the Court expressly quoted a portion of the legislative history stating that suits under §502(a) could be brought both in federal and in state court, id. at 65, and analogized the preemptive effect of §502(a) to the similar effect of §301 of the Labor-Management Relations Act which, although completely preemptive, permits actions both in federal and in state courts. Id. at 66. See generally Lingle v. Norge Division of Magic Chef, Inc., 486 U.S. 399, 403 n. 2 (1988). When used substantively, successful invocation of §502(a)(1)(B) transforms a claim ostensibly arising under state law into a claim brought under ERISA with all of the benefits and limitations that such a claim embodies. See Peters v. Union Pac. R.R. Co., 80 F.3d 257, 260 (8th Cir. 1996); Rice v. Panchal, 65 F.3d 637, 640 (7th Cir. 1995); Aaron v. National Union Fire Ins. Co., 876 F.2d 1157, 1160-63 (5th Cir. 1989); Heichman v. American Telephone & Telegraph Co., 943 F.Sup. 1212, 1220 (C.D. Calif. 1995); Constatine v. Minis, 910 F.Sup. 657, 661-62 (S.D. Ga. 1995). See generally Lingle v. Norge Division of Magic Chef, Inc., supra 486 U.S. at 405-06. By way of contrast, “incomplete” preemption simply provides a defense to a conflicting state- *578 law claim. See, e.g., Rice v. Panchal, supra; Dukes v. U.S. Healthcare, Inc., 57 F.3d 350, 355 (3rd Cir. 1995); Farmers Cooperative Elevator v. Doden, 946 F.Sup. 718, 728 (N.D. Iowa 1996). The preemption question, complete or partial, is important, inter alia, because of the answer’s impact on the availability of claims for money damages. See ERISA, §502(a); 29 U.S.C. §1132(a); Mertens v. Hewitt Associates, 508 U.S. 248, 251-63 (1993); Ingersoll-Rand Co. v. McClendon, 498 U.S. 133, 136, 142-45 (1990); Massachusetts Mutual Life Ins. Co. v. Russell, 473 U.S. 134, 147 (1985).

 Section 514(a) thus does not create a federal question authorizing removal of the case to a federal court. See, e.g., Dukes v. U.S. Healthcare, supra, 57 F.3d at 355. Instead, the state court has the responsibility for determining whether, and to what extent, a conflict between ERISA and state law actually exists and, on the basis of that decision, determining which provision applies.

 The text of a statute, of course, usually offers an excellent guide to the congressional intent. See Harris v. Wilcox, 384 Mass. 57, 59 (1981).

 The HCHP plan, as noted earlier, provided that HCHP would provide to plan participants like Mrs. Nascimento all “medically necessary” treatment. No one contends, however, that the phrase “medically necessary” sets up some kind of a contractual standard for providing services that differs in any meaningful fashion from a health-care provider’s common-law obligation to provide to a patient the kinds of services that are consistent with the services that would be provided by the average qualified practitioner in the same specialty under the same circumstances. In this case, therefore, there is no necessity to plumb the depths of the contractual language in order to determine whether or not the physicians’ decision to provide Mrs. Nascimento with chemotherapy instead of with bone marrow transplantation therapy was consistent with some unique contractual provision regarding the care she was entitled to receive.

 Were that not the case, the Count simply would be redundant.

 ERISA defines a “plan” as “any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services, or (B) any benefit described in Section 186(c) of this title (other than pensions on retirement or death, and insurance to provide such pensions).” 29 U.S.C. §1002(1). In her amicus brief, the Secretaiy of Labor appeared to argue that the ERISA “plan" was limited to the contract between Harvard and the Union under which Harvard agreed to provide health care services. The HCHP contract, the Secretaiy appeared to say, simply was the vehicle through which Harvard implemented the “plan.” Brief of Secretary of Labor at 14. The United States Court of Appeals for the Third Circuit interpreted the brief the Secretary filed in Dukes v. U.S. Healthcare, Inc., 57 F.3d 350, 356 (3rd Cir. 1995), as making essentially the same argument. The court there assumed without deciding that health care, and not simply plan membership, was the relevant benefit and nevertheless found no preemption. In Jass v. Prudential Health Care Plan, Inc., 88 F.3d 1482, 1489 (7th Cir 1996), a case in which the Secretaiy filed no brief, the court, without discussion, concluded that the medical insurance agreement provided by Prudential pursuant to an agreement with plaintiffs employer was the ERISA plan and that one of plaintiffs claims was preempted. After an extended analysis, however, the Supreme Court of California squarely concluded, although not unanimously, that health care insurance purchased by an employer for its employees and administered by a third party was an ERISA plan even if neither the employer nor the insurer nor the plan administrator complied with ERISA’s reporting requirements and even if the employer did not intend to create an ERISA plan. Marshall v. Bankers Life & Cas. Co., 832 P.2d 573, 581 (Cal. 1992) (in bank). See also Nealy v. U.S. Healthcare HMO, 844 F.Sup. 966, 972 (S.D.N.Y. 1994); Blue Cross & Blue Shield of Alabama v. Peacock’s Apothecary, Inc., 567 F.Sup. 1258, 1267 (N.D. Ala 1983). Similarly, in Grimo v. Blue Cross/Blue Shield of Vermont, 34 F.3d 148, 150 (2d Cir. 1994), the court stated that “the role played by an employer in the obtaining of health insurance is important to a determination of whether that insurance is an ERISA plan.” (Emphasis added). Since her initial brief was filed, the Secretary has expressly disavowed any intent on her part to claim that the ERISA “plan” was limited to the contract between Harvard and the Union. That disavowal was surely correct. Considering the cited cases and the broad purposes of ERISA, I am of the opinion that the ERISA plan in this case includes the HCHP contract and is not limited to Harvard’s agreement to provide health care. To conclude that the ERISA “plan” was simply the contract between Harvard and the Union would give ERISA, here and in similar cases, a relatively minor role in regulation and oversight of the benefits employees actually received under employer-created plans and would be inconsistent with the broadly regulatory impact the statute manifestly was designed to have.

 My earlier conclusion that Count V is preempted by §502(a) necessarily means that that Count is preempted under §514(a). No farther examination of that Count therefore is necessary.

 She also sued the plan on a theory of vicarious liability for the alleged negligence of the treating physician. The vicarious liability portions of the Court’s decision in Jass, relied on initially by HCHP in its brief, are now irrelevant because HCHP has withdrawn its motion for summary judgment with respect to Counts 9 and 13. Seen. 1, supra In any event, insofar as the Court’s decision can be read to conclude that a claim of vicarious liability is automatically preempted by §514(a), the decision is unpersuasive.

 In that regard, the court observed that the nurse’s only contact with plaintiff had been in the nurse’s capacity as a utilization review administrator for the plan who had determined "the appropriate health benefits due [plaintiff] under the Certificate of Insurance,” the plan had issued. Id. at 1489. As Mrs. Nascimento has argued here, it may be in this case that HCHP physicians who provided plaintiff with treatment functioned both as health care providers and as utilization review administrators. The present record on that point is not entirely clear. Even if HCHP physicians actually functioned, at least in part, as plan administrators, however, I am of the opinion that the result would not change. When a physician makes a decision both as a plan administrator and as a health care provider, only a metaphysician can separate the components of the treatment decision rooted in plan considerations from those rooted in pure medical judgments, particularly when the plan covers all medically necessary treatment. The dominant force behind the healthcare provider’s decision in those circumstances is, and should be, his or her obligation to treat the patient in a medically appropriate fashion. That dominant force, and not forces set in motion by desires for uniformity in multi-state benefit plans, ought to provide the framework for determining the extent to which ERISA does or does not impact on the state-law’s effort to deal with the consequences of treatment that fails to achieve its intended, or hoped for, result.