# United States Court of Appeals
## For the First Circuit

No. 23-1267

IN RE: THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, as Representative for the Commonwealth of Puerto Rico; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, as Representative for the Puerto Rico Sales Tax Financing Corporation, a/k/a Cofina; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, as Representative for the Employees Retirement System of the Government of the Commonwealth of Puerto Rico; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, as Representative for the Puerto Rico Highways and Transportation Authority; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, as Representative for the Puerto Rico Electric Power Authority (PREPA); THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, as Representative of the Puerto Rico Public Buildings Authority,

Debtors,

THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, as Representative for the Commonwealth of Puerto Rico,

Plaintiff, Appellee,

v.

RAFAEL HERNÁNDEZ-MONTAÑEZ,

Defendant, Appellant,

PEDRO PIERLUISI-URRUTIA,

Defendant, Appellee.

No. 23-1268

IN RE: THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO
RICO, as Representative for the Commonwealth of Puerto Rico; THE
FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, as
Representative for the Puerto Rico Sales Tax Financing
Corporation, a/k/a Cofina; THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO, as Representative for the
Employees Retirement System of the Government of the
Commonwealth of Puerto Rico; THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO, as Representative for the
Puerto Rico Highways and Transportation Authority; THE FINANCIAL
OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, as
Representative for the Puerto Rico Electric Power Authority
(PREPA); THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO
RICO, as Representative of the Puerto Rico Public Buildings
Authority,

Debtors,

_____

THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, as
Representative for the Commonwealth of Puerto Rico,

Plaintiff, Appellee,

v.

PEDRO PIERLUISI-URRUTIA,

Defendant, Appellant,

RAFAEL HERNÁNDEZ-MONTAÑEZ,

Defendant, Appellee.

_____

No. 23-1358

IN RE: THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO
RICO, as Representative for the Commonwealth of Puerto Rico; THE
FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, as
Representative for the Puerto Rico Sales Tax Financing
Corporation, a/k/a Cofina; THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO, as Representative for the
Employees Retirement System of the Government of the
Commonwealth of Puerto Rico; THE FINANCIAL OVERSIGHT AND

MANAGEMENT BOARD FOR PUERTO RICO, as Representative for the Puerto Rico Highways and Transportation Authority; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, as Representative for the Puerto Rico Electric Power Authority (PREPA); THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, as Representative of the Puerto Rico Public Buildings Authority,

Debtors,

---

THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, as Representative for the Commonwealth of Puerto Rico,

Plaintiff, Appellee,

v.

PEDRO PIERLUISI-URRUTIA,

Defendant, Appellant,

RAFAEL HERNÁNDEZ-MONTAÑEZ,

Defendant, Appellee.

---

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Laura Taylor Swain,[*] U.S. District Judge]

---

Before

Kayatta, Lynch, and Howard,
Circuit Judges.

---

Jorge Martínez-Luciano, with whom Emil Rodríguez-Escudero and M.L. & R.E. Law Firm were on brief, for appellant Rafael Hernández-Montañez.
Matthew P. Kremer and William J. Sushon, with whom John J.

---

[*] Of the Southern District of New York, sitting by designation.

Rapisardi, Peter Friedman, O'Melveny & Myers LLP, Luis C. Marini-Biaggi, Carolina Velaz Rivero, and Marini Pietrantoni Muñiz LLC were on brief, for appellant Pedro Pierluisi-Urrutia.

Mark D. Harris and Timothy W. Mungovan, with whom Martin J. Bienenstock, Julia D. Alonzo, Shiloh A. Rainwater, John E. Roberts, Guy Brenner, Shannon D. McGowan, Lucas Kowalczyk, and Proskauer Rose LLP were on brief, for appellee The Financial Oversight and Management Board for Puerto Rico.

August 10, 2023

**KAYATTA, Circuit Judge.** In June 2022, the Governor of Puerto Rico signed Act 41-2022 into law, tightening certain labor regulations that had been loosened about five years earlier. The Financial Oversight and Management Board for Puerto Rico (the "Board" or the "Oversight Board") argues that the Governor failed to submit the documentation necessary to demonstrate that Act 41 complied with the Board's fiscal plan for the Commonwealth, as required pursuant to the Puerto Rico Oversight, Management, and Economic Stability Act (PROMESA).

The Board sued the Governor to block the law's implementation, filing an adversary proceeding in the district court overseeing Puerto Rico's bankruptcy process under Title III of PROMESA. The Board then moved for summary judgment, and the Governor filed a motion for judgment on the pleadings, arguing that the "Title III court" lacked subject matter jurisdiction over the dispute. The district court, after concluding it had jurisdiction, granted the Board's motion for summary judgment and nullified the law. For the following reasons, we affirm the judgment of the district court.

I.

A.

We begin with an overview of those sections of PROMESA that provide the foundation for this appeal.[1]  Congress enacted PROMESA in 2016 "to address the Commonwealth's fiscal crisis, facilitate restructuring of its public debt, ensure its future access to capital markets, and provide for its long-term economic stability."  Pierluisi v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.), 37 F.4th 746, 750 (1st Cir. 2022).  PROMESA established the Oversight Board and gave it "wide-ranging authority to oversee and direct many aspects of Puerto Rico's financial recovery efforts."  Id.  Two of PROMESA's tools for "address[ing] the Commonwealth's fiscal crisis" are centrally relevant here: periodic fiscal plans certified by the Board, and a bankruptcy-like proceeding resulting in a plan of adjustment.  See id.; Fin. Oversight & Mgmt. Bd. for P.R. v. Federacion de Maestros de P.R., Inc. (In re Fin. Oversight & Mgmt. Bd. for P.R.), 32 F.4th 67, 75 (1st Cir. 2022).  We describe each in turn.

1.

PROMESA Title II empowers the Board to, among other things, develop and certify "fiscal plans" for the Commonwealth

_____

[1]  All uses of "section" refer to PROMESA, Pub. L. No. 114-187, 130 Stat. 549 (2016), unless otherwise specified.

and its instrumentalities.  See 48 U.S.C. § 2141.  Fiscal plans must "provide a method to achieve fiscal responsibility and access to the capital markets," covering a period of at least five years. 48 U.S.C. § 2141(b)(1)-(2).  In order to ensure the government's compliance with the policies and financial strategies set forth in certified fiscal plans, section 204(a) "outlines a multi-step, back-and-forth process by which the Oversight Board reviews Commonwealth legislation for consistency with" such plans. Pierluisi, 37 F.4th at 751; see 48 U.S.C. § 2144(a).

Section 204(a)(1) requires the Governor to submit all newly enacted laws to the Board within seven business days of the relevant law's enactment.  48 U.S.C. § 2144(a)(1). Section 204(a)(2) provides that, along with the text of the new law, the Governor must also submit: (i) "[a] formal estimate prepared by an appropriate entity of the territorial government with expertise in budgets and financial management of the impact, if any, that the law will have on expenditures and revenues"; and (ii) a certification by that same entity as to whether the law is or is not "significantly inconsistent with the Fiscal Plan for the fiscal year."  Id. § 2144(a)(2).  If the relevant entity determines that the law is "significantly inconsistent," it must provide the "reasons for such finding."  Id.

Following the Governor's submission, PROMESA puts the ball in the Board's court.  Pursuant to section 204(a)(3), the

Board must "notif[y] the Governor and the Legislature if a submission is problematic, either because it lacks a formal estimate or certification, or because the certification states that the law is significantly inconsistent with the fiscal plan." Pierluisi, 37 F.4th at 751; see 48 U.S.C. § 2144(a)(3). Further, under section 204(a)(4), the Board "may direct the Commonwealth to provide the missing estimate or certification, or, if the Commonwealth has certified that the law is inconsistent with the fiscal plan, may direct the Commonwealth to 'correct the law to eliminate the inconsistency' or 'provide an explanation for the inconsistency that the Oversight Board finds reasonable and appropriate.'" Pierluisi, 37 F.4th at 751 (quoting 48 U.S.C. § 2144(a)(4)). Finally, section 204(a)(5) provides that if the Commonwealth "fails to comply with a direction given by the Oversight Board under [section 204(a)(4)] with respect to a law, the Oversight Board may take such actions as it considers necessary, consistent with [PROMESA], to ensure that the enactment or enforcement of the law will not adversely affect the territorial government's compliance with the Fiscal Plan, including preventing the enforcement or application of the law." 48 U.S.C. § 2144(a)(5).

Related to the Board's power under section 204(a)(5) to prevent "the enforcement . . . of the law," id., is a prohibition contained in section 108(a)(2), which applies broadly to constrain

- 8 -

the Commonwealth's legislative power and is not limited to the context of fiscal plans. That section provides: "Neither the Governor nor the Legislature may . . . enact, implement, or enforce any statute, resolution, policy, or rule that would impair or defeat the purposes of [PROMESA], as determined by the Oversight Board." 48 U.S.C. § 2128(a)(2). And section 104(k) gives teeth to the Board's aforementioned powers to intervene in the Commonwealth's legislative process, providing that "[t]he Oversight Board may seek judicial enforcement of its authority to carry out its responsibilities under [PROMESA]." 48 U.S.C. § 2124(k).

**2.**

PROMESA also created, through Title III, "a modified version of the municipal bankruptcy code for territories and their instrumentalities." Federacion de Maestros, 32 F.4th at 75. "Title III authorize[s] the Board to place the Commonwealth and its instrumentalities into bankruptcy proceedings." Id. As elaborated further below, district courts have jurisdiction over the Commonwealth's bankruptcy proceedings, and the District of Puerto Rico is the proper venue for such proceedings. See 48 U.S.C. §§ 2166(a), 2167. Pursuant to section 308(a), Chief Justice Roberts designated Judge Laura Taylor Swain of the Southern District of New York "to sit by designation" in the District of Puerto Rico and "conduct the [Title III] case." See 48 U.S.C.

§ 2168(a); Pierluisi, 37 F.4th at 751 n.4.  The Board commenced the Title III case on behalf of the Commonwealth on May 3, 2017, and the "Title III court" -- the name commonly used to refer to the court sitting pursuant to the Chief Justice's section 308(a) designation -- confirmed the Commonwealth's plan of adjustment on January 18, 2022.  In re Fin. Oversight & Mgmt. Bd. for P.R., 636 B.R. 1, 6 (D.P.R. 2022).

## B.

The Board brought this lawsuit to block enforcement of Act 41-2022, which the Governor signed into law on June 20, 2022. All parties agree that Act 41 amends certain provisions of the Labor Transformation and Flexibility Act (LTFA or "Act 4-2017"). The LTFA, enacted in January 2017, generally sought to loosen rules imposed on private-sector employers.  Act 41 reverses the LTFA's loosening of rules regarding sick leave, vacation leave, Christmas bonus eligibility, employee probationary periods, and employers' obligations to justify employee dismissals.

Each of the Board's certified Commonwealth fiscal plans, dating back to the first one certified on March 13, 2017, has recommended deregulatory changes viewed by the Board as increasing labor participation.  As relevant here, the 2021 certified plan expressed concern that repeal of the LTFA would "discourage new hiring and reduce . . . labor market flexibility," declaring that "the Government must refrain from repealing Act 4-2017 or enacting

- 10 -

new legislation that negatively impacts labor market flexibility." The Board repeated these statements in the fiscal plan certified on January 27, 2022.

Nonetheless, on March 10, 2022, the Puerto Rico House of Representatives passed HB 1244 -- the bill that would later become Act 41. Eight days later, the Board issued a resolution directing the Senate not to pass HB 1244 and the Governor not to enact or implement it, in part because the bill "propose[d] to repeal portions of the LTFA and reestablish many of the burdensome labor restrictions that existed prior to the passage of the LTFA." The resolution further advised that the Commonwealth was barred from enacting the bill under section 108(a)(2), which, as described above, prohibits the Governor and the legislature from enacting or implementing any statute "that would impair or defeat the purposes of [PROMESA]." 48 U.S.C. § 2128(a). The Board approved taking legal action pursuant to section 104(k) to block enactment or enforcement of the bill.

The legislature then passed the bill on June 7, 2022. In response, the Board sent a letter to the Governor notifying him that the Board "ha[d] determined that HB 1244 impairs and defeats PROMESA's purposes." The letter continued, "By seeking to repeal the LTFA's reforms, the Bill is significantly inconsistent with the Certified Fiscal Plan. You are barred from signing the Bill into law by PROMESA Section 108(a)(2)." The Board further

- 11 -

explained that if the Governor decided to sign the law, he would be required to submit a formal estimate and certification pursuant to section 204(a), and such estimate would need to "address the full economic impact of the issues raised in this letter, including how the Bill's impact on labor force participation will affect revenues."

The Governor signed HB 1244 into law on June 20, 2022, thus triggering the section 204(a) review process at the heart of this appeal. On June 29, the Puerto Rico Fiscal Agency and Financial Advisory Authority (AAFAF), acting on behalf of the Governor, submitted its section 204(a)(2) cost estimate and certification to the Board (the "Section 204(a) Submission"). The Section 204(a) Submission explained that "Act 41 seeks to improve the labor markets in Puerto Rico by: a) increasing the labor supply through improvements in the compensation of private sector employees and integration of new entrants into the formal workforce; and b) promoting increased labor market participation." With respect to the law's impact on the LTFA and compliance with the most recent fiscal plan, the report concluded:

> [T]he most important labor market reforms of Act 4-2017 were preserved and continue in effect post-Act 41 enactment. Specifically, only 13 of the 72 substantive sections of Act 4-2017 were subject to any modification . . . .
>
> Although Act 41 is consistent with the plain language [of the 2022 certified fiscal plan],

- 12 -

in as much as it does not repeal Act 4-2017, an argument can be made that Act 41 "negatively impacts labor market flexibility." A close examination of Act 41 shows that it continues to largely preserve Act 4-2017's structural reforms and when taking into consideration the analysis provided herein, one may conclude Act 41 is not significantly inconsistent with the [2022] Fiscal Plan.

And regarding the law's economic impact, the AAFAF stated:

[N]otwithstanding Act 41's expected positive impact on the labor supply, the ultimate economic impact of Act 41 will need to be evaluated while considering broader and competing macroeconomic factors affecting the Puerto Rico economy, including: U.S. inflationary pressure, global supply-chain constraints, and the continuing energy crisis. Considering the limitations on economic and labor statistics in Puerto Rico, including long reporting lags and limitations around coverage and national comparability, it is difficult to perform current and reliable economic analysis geared towards accurately isolating and measuring Act 41's impact on the Puerto Rico Economy vis-a-vis competing macroeconomic supply and inflation shocks, whose size and scope are unprecedented in the last four decades of data in the United States. Hence, a comprehensive economic analysis requires the design of Puerto Rico-specific empirical studies in order to capture the subtleties of Act 41's differing treatment of subclasses within the Puerto Rico labor market.

The Section 204(a) Submission included as attachments fiscal impact certifications from the Puerto Rico Department of Treasury and the Puerto Rico Office of Management and Budget.

These certifications -- which were completed on standardized two-page forms -- indicated that Act 41 would have no impact on government revenue and reported that the impact on expenditures would be limited to $3,000, with such cost attributable to the publication of notices by the Puerto Rico Department of Labor.[2]

On July 19, 2022, the Board, pursuant to section 204(a)(3), notified the Governor and the legislature that the Section 204(a) Submission did not include "the required certification and formal estimate for Act 41." With respect to the estimate, the Board described that the Governor had failed to "assess[] [Act 41's] impact on the economy and on the Commonwealth's revenues and expenditures." The Board then explained that the submission's certification was inadequate because "the absence of a proper formal estimate . . . necessarily means that the certification is also deficient," and, in any event, Act 41 is significantly inconsistent with the fiscal plan. Citing section 204(a)(4), the Board "direct[ed] the Governor to provide the missing formal estimate and certification" by July 22. The letter further provided, "given the Oversight Board's determination that the Act impairs and/or defeats the purposes of PROMESA, the Government must immediately suspend the law's

_____

[2] A subsequent update provided that the Department of Labor only spent $1,248.12 publishing the required notices, rather than $3,000 as initially estimated.

- 14 -

implementation and enforcement -- at least until the Government and the Oversight Board have fully exchanged their views concerning Act 41 and the Oversight Board changes its determination (which may not occur)."

The AAFAF responded three days later, "strongly disagree[ing] with the assertion that the [Section 204(a) Submission] is non-compliant with PROMESA Section 204(a)'s requirements," and repeating the assertion that "[a] comprehensive economic analysis of Act 41 [would be] an ambitious and expansive undertaking that would require economists to design Puerto Rico-specific empirical studies and economic models."  The Board and the AAFAF subsequently exchanged several more letters, with each party maintaining its position regarding the adequacy of the Section 204(a) Submission.

## C.

On September 1, 2022, the Board initiated this adversary proceeding under Title III against the Governor.  The Board sought an order nullifying Act 41 based on two independent claims: (i) the Board's determination pursuant to section 108(a)(2) that Act 41 "impair[s] or defeat[s] the purposes of [PROMESA]," 48 U.S.C. § 2128(a), and (ii) the Governor's failure to provide the required certification and formal estimate pursuant to section 204(a).  The Speaker of the Puerto Rico House of Representatives intervened as a defendant on behalf of the House.

- 15 -

The Board moved for summary judgment on September 29, 2022. On the same day, the Governor filed a Rule 12(c) motion for judgment on the pleadings, arguing that the court lacked subject matter jurisdiction. The district court granted the Board's motion with respect to section 204(a) -- nullifying Act 41 and any actions taken to implement it -- and denied the Governor's Rule 12(c) motion. The court subsequently dismissed as moot the Board's claim with respect to section 108(a)(2). The Governor and the Speaker timely appealed.

## II.

We review the district court's grant of summary judgment de novo, "construing the record in the light most favorable to the non-moving party." López-Santos v. Metro. Sec. Servs., 967 F.3d 7, 11 (1st Cir. 2020). We likewise review de novo the district court's denial of the Governor's 12(c) motion. Shay v. Walters, 702 F.3d 76, 79 (1st Cir. 2012).

The Governor and the Speaker raise two principal arguments on appeal: first, that the "Title III court" lacks subject matter jurisdiction over the Board's section 204(a) claim; and second, that the Governor's Section 204(a) Submission complied with the formal estimate and certification requirements. We address these arguments in turn.

- 16 -

**A.**

We begin with a technical, but important point: There is only one court at issue in this case -- the United States District Court for the District of Puerto Rico. And that court clearly has subject matter jurisdiction over this lawsuit, either under 28 U.S.C. § 1331 because, as all parties agree, this case turns on the resolution of federal questions, or under PROMESA section 306(a)(2), which gives the court "original but not exclusive jurisdiction of all civil proceedings arising under [Title III], or arising in or related to cases under [Title III]." 48 U.S.C. § 2166(a)(2).

So the argument by the Governor and the Speaker that the court below lacks subject matter jurisdiction cannot succeed. Rather, the argument must be that this case should not have been assigned to Judge Swain because subject matter jurisdiction rests only on 28 U.S.C. § 1331, and not on section 306(a)(2). According to this argument, because Judge Swain was specifically designated "to conduct the [Title III] case," 48 U.S.C. § 2168(a), "where a dispute does not fit within the jurisdictional parameters of [section 306(a)(2)] . . . it should not be entertained as an adversary proceeding overseen by [her]." Fin. Oversight & Mgmt. Bd. for P.R. v. Pierluisi (In re Fin. Oversight & Mgmt. Bd. for P.R.), 650 B.R. 334, 348 (D.P.R. 2023).

Assuming without deciding that Judge Swain's mandate is so limited, and that exceeding that mandate would provide sufficient grounds for reversal, we nevertheless reject the argument. We conclude that the Board's section 204(a) claim -- which served as the basis for the district court's decision on the merits -- falls within the ambit of Title III's jurisdictional grant.

As noted above, section 306(a)(2) provides that district courts generally have "original but not exclusive jurisdiction of all civil proceedings arising under [Title III], or arising in or related to cases under [Title III]." 48 U.S.C. § 2166(a)(2). This language mirrors 28 U.S.C. § 1334(b), which gives district courts jurisdiction over certain title 11 bankruptcy matters. See 28 U.S.C. § 1334(b) ("[T]he district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11."); Asociación de Salud Primaria de P.R., Inc. v. Puerto Rico (In re Fin. Oversight & Mgmt. Bd. for P.R.), 330 F. Supp. 3d 667, 680 (D.P.R. 2018). Accordingly, the parties agree that our prior decisions interpreting that jurisdictional provision under title 11 should, at least to some extent, inform our interpretation of Title III's jurisdictional bounds.

In Gupta v. Quincy Medical Center, 858 F.3d 657 (1st Cir. 2017), we outlined the three forms of title 11 jurisdiction

listed in 28 U.S.C. § 1334(b) -- "arising under," "arising in," and "related to." Id. at 661-63. First, "proceedings 'aris[e] under title 11' when the Bankruptcy Code itself creates the cause of action." Id. at 662 (alteration in original). Second, "[w]e have defined 'arising in' proceedings generally as 'those that are not based on any right expressly created by title 11, but nevertheless, would have no existence outside of the bankruptcy.'" Id. at 662-63 (quoting Middlesex Power Equip. & Marine, Inc. v. Town of Tyngsborough (In re Middlesex Power Equip. & Marine, Inc.), 292 F.3d 61, 68 (1st Cir. 2002)). Third, "'related to' proceedings are those 'which "potentially have some effect on the bankruptcy estate, such as altering debtor's rights, liabilities, options, or freedom of action, or otherwise have an impact upon the handling and administration of the bankrupt estate."'" Id. at 663 (quoting In re Middlesex Power Equip. & Marine, Inc., 292 F.3d at 68).

"Arising under" jurisdiction is not at issue here, as it is undisputed that Title III itself did not create the Board's cause of action. The Board brought this case based on provisions within PROMESA Title I (sections 108(a) and 104(k)) and Title II (section 204(a)). That leaves "arising in" and "related to" jurisdiction; and because "related to" is the broader of the two concepts, we begin there.

As described above, "'related to' proceedings are those 'which "potentially have some effect on the bankruptcy

estate . . . or otherwise have an impact upon the handling and administration of the bankrupt estate."'" Id. This test is commonly referred to as the Pacor standard, based on the Third Circuit case that initially developed it. Pacor, Inc. v. Higgins, 743 F.2d 984, 994 (3d Cir. 1984). We have observed that "[a]lthough 'related to' jurisdiction 'cannot be limitless,' it is nonetheless 'quite broad.'" Gupta, 858 F.3d at 663 (citation omitted) (first quoting Celotex Corp. v. Edwards, 514 U.S. 300, 308 (1995); and then quoting Bos. Reg'l Med. Ctr., Inc. v. Reynolds (In re Bos. Reg'l Med. Ctr., Inc.), 410 F.3d 100, 105 (1st Cir. 2005)).

The Governor and the Speaker, however, urge us to apply the "close nexus" test -- a narrower conception of "related to" jurisdiction that several other circuits, but not the First Circuit, have adopted in the context of disputes arising after confirmation of a bankruptcy plan. See, e.g., Binder v. Price Waterhouse & Co., LLP (In re Resorts Int'l, Inc.), 372 F.3d 154, 166-67 (3d Cir. 2004) (defining the "close nexus" test); Montana v. Goldin (In re Pegasus Gold Corp.), 394 F.3d 1189, 1194 (9th Cir. 2005) (adopting the Third Circuit's "close nexus" test); Valley Historic Ltd. P'ship v. Bank of N.Y., 486 F.3d 831, 836- 837 (4th Cir. 2007) (adopting the Third Circuit's "close nexus" test); Bank of La. v. Craig's Stores of Tex., Inc. (In re Craig's Stores of Tex., Inc.), 266 F.3d 388, 390-91 (5th Cir. 2001)

(adopting a test that narrowed post-confirmation bankruptcy jurisdiction, similar to the "close nexus" test); Pettibone Corp. v. Easley, 935 F.2d 120, 122-23 (7th Cir. 1991) (concluding that bankruptcy jurisdiction narrows following confirmation).

Under the "close nexus" test, as articulated by the Third Circuit, "the essential inquiry [is] whether there is a close nexus to the bankruptcy plan or proceeding sufficient to uphold bankruptcy court jurisdiction over the matter. . . . Matters that affect the interpretation, implementation, consummation, execution, or administration of the confirmed plan will typically have the requisite close nexus." In re Resorts, 372 F.3d at 166-67. The test arose in part because the Pacor standard cannot be applied literally in the post-confirmation context. "[I]t is impossible for the bankrupt debtor's estate to be affected by a post-confirmation dispute because the debtor's estate ceases to exist once confirmation has occurred." Id. at 165. The Third Circuit further observed that "bankruptcy court jurisdiction 'must be confined within appropriate limits and does not extend indefinitely, particularly after the confirmation.'" Id. at 164 (quoting Donaldson v. Bernstein, 104 F.3d 547, 553 (3d Cir. 1997)).

We declined to apply the "close nexus" test in In re Boston Regional, which analyzed a post-confirmation dispute in the context of a chapter 11 plan of liquidation. 410 F.3d at 106-07. In distinguishing that case from In re Resorts and others that

have narrowed bankruptcy jurisdiction following confirmation, we pointed to differences between liquidating plans and "true reorganization plans," where "the corporation moves on" following the bankruptcy. Id. Crucially, we observed that "context is important," and "what is 'related to' a proceeding under title 11 in one context may be unrelated in another." Id. "The existence vel non of related to jurisdiction must be determined case-by-case." Id. at 107.

That logic guides our reasoning here. While general principles from our title 11 case law are instructive, those same principles dictate that we cannot rigidly import the jurisdictional tests from that context to this case. With the "sui generis nature of PROMESA" in mind, Federacion de Maestros, 32 F.4th at 78 (quoting Peaje Invs. LLC v. García-Padilla, 845 F.3d 505, 513 (1st Cir. 2017)), it becomes clear that what might be "related to" a Title III case is distinct from what might be "related to" a title 11 bankruptcy case.

So the central jurisdictional question on appeal is, simply put, whether the Board's claim -- that the Governor violated section 204(a) by failing to submit the requisite estimate and certification for Act 41 -- is "related to" the Commonwealth's Title III case, in which the Title III court confirmed the Commonwealth's plan of adjustment five months prior to Act 41's enactment.

- 22 -

The nature of the statutory scheme here provides the answer. "In enacting PROMESA, Congress found that '[a] comprehensive approach to fiscal, management, and structural problems and adjustments . . . is necessary, involving independent oversight and a Federal statutory authority for the Government of Puerto Rico to restructure debts in a fair and orderly process.'" Id. at 74 (alteration in original) (quoting 48 U.S.C. § 2194(m)(4)). The fiscal plans developed under Title II and the bankruptcy procedures established under Title III are both part of that "comprehensive approach" -- complementary policy tools focused on the same goal. Section 314(b)(7) further demonstrates their complementary nature. That provision requires, as a condition precedent to the confirmation of the plan of adjustment, that the "plan [be] consistent with the applicable Fiscal Plan certified by the Oversight Board under [Title] II." 48 U.S.C. § 2174(b)(7); see In re Fin. Oversight & Mgmt. Bd. for P.R., 636 B.R. at 220, ex. A, ¶ 85.1(a). And just as a provision in Title III explicitly requires consistency with the fiscal plan certified under Title II, a provision in Title II explicitly requires consistency with the plan of adjustment confirmed under Title III: section 201(b)(1)(M) provides that fiscal plans may not call for the transfer of assets between territorial entities, unless such transfer is permitted by the plan of adjustment. 48 U.S.C. § 2141(b)(1)(M).

- 23 -

Given this backdrop, we conclude that the Board's efforts to enforce the Commonwealth's certified fiscal plan through section 204(a) are, at a minimum, "related to" the Commonwealth's Title III case.[3] Any differences between the pre- and post-confirmation manifestations of the "related to" test are largely irrelevant in this context. In a typical bankruptcy case analyzing "relatedness," the court analyzes whether a claim arising under an area of law entirely unrelated to title 11 (e.g., contract or tort) is "related to" the bankruptcy case. See, e.g., In re Bos. Reg'l, 410 F.3d at 108 (charitable bequests); In re Resorts, 372 F.3d at 156–57 (professional malpractice and breach of contract); Pacor, 743 F.2d at 985 (products liability); Valley Historic Ltd. P'ship, 486 F.3d at 833 (breach of contract and tortious interference). Here, the substantive provisions underlying the Board's claim were enacted in the same piece of legislation and directed toward the same goal as Title III. That claim is thus "related" -- in a fundamental sense -- to the Commonwealth's Title III case; and this relation is quite different from the way a contract claim, for instance, may or may not be related to a traditional bankruptcy case.

The Governor argues that our conclusion here "would extend bankruptcy jurisdiction over virtually every dispute

_____

[3] For this reason, we need not address whether this dispute "aris[es] in" the Title III case.

between the Government and the Board for years to come," violating "the bedrock principle of limited bankruptcy court jurisdiction, particularly post-confirmation." But the key rationales for applying "related to" jurisdiction more narrowly in the post-confirmation context are missing here. First, as we observed in In re Boston Regional, a broad post-confirmation construction of "related to" jurisdiction "would unfairly advantage reorganized debtors by allowing such firms to funnel virtually all litigation affecting them into a single federal forum." 410 F.3d at 106. Here, by contrast, it is plain that the Commonwealth enjoys no "unfair[] advantage" by having this dispute heard in the Title III court; after all, the Governor and the Speaker -- the parties arguing that the case cannot be heard in the Title III court -- both claim to be representing the Commonwealth's best interests. And the appropriate forum, according to the Governor and the Speaker, is a non-Title III court sitting in the District of Puerto Rico. So this case is about whether the Board's claims should be heard by one judge or another within the District of Puerto Rico -- a far cry from a reorganized debtor seeking to "funnel" claims that would ordinarily be heard in state or federal courts across the country "into a single federal forum." Id.

Another reason for narrowing bankruptcy jurisdiction with respect to reorganized corporate debtors is that "as the corporation moves on, the connection [to the bankruptcy]

- 25 -

attenuates." Id. at 107. But under PROMESA, the Commonwealth does not simply "move on" from its fiscal crisis once the plan of adjustment is confirmed. The Board's oversight of the Commonwealth's financial recovery -- including through the development and enforcement of fiscal plans -- continues until the Board terminates.[4]

Our conclusion today does not result in limitless "related to" jurisdiction. We address only whether this dispute -- regarding the application of PROMESA's fiscal plan compliance rules to newly enacted legislation -- "relates to" the Commonwealth's Title III case.[5] There must, of course, be some limit to what is "related to" a Title III case. Cf. N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co., 514 U.S. 645, 655 (1995) (explaining, in the context of analyzing a

---

[4] Under section 209, the Board will terminate once the Board certifies that Puerto Rico (i) "has adequate access to short-term and long-term credit markets at reasonable interest rates" and (ii) has experienced balanced budgets, developed in accordance with modified accrual accounting standards, for at least four consecutive fiscal years. 48 U.S.C. § 2149.

[5] The Speaker points out that the Board has certified fiscal plans for a variety of territorial instrumentalities that have not been placed in Title III proceedings (e.g., the University of Puerto Rico and the Puerto Rico Aqueduct and Sewer Authority). We do not opine on the circumstances in which disputes centering on such instrumentalities may or may not "relate to" the Commonwealth's Title III case. Here, the fiscal plan for the Commonwealth itself (rather than one of its instrumentalities) is the focus of this dispute, and it is the Commonwealth's Title III proceeding that this dispute is "related to."

statute that preempted state laws "relate[d] to" a particular subject, that "[i]f 'relate to' were taken to extend to the furthest stretch of its indeterminacy, then for all practical purposes pre-emption would never run its course . . . . But that, of course, would be to read Congress's words of limitation as mere sham . . . ."). Stronger arguments against jurisdiction will certainly arise where one of PROMESA's tools for financial reform does not provide the basis for the claim. But this dispute comfortably falls within the bounds of "related to" jurisdiction, the outer limits of which we need not now limn.

**B.**

Having concluded that Judge Swain properly acted within the scope of her designation, we now address the merits of the section 204(a) claim. The Governor and the Speaker assert that the Governor provided the requisite formal estimate of Act 41's financial impact and certification of the law's consistency with the fiscal plan. Because there is no dispute that the certification must rely on an appropriate formal estimate -- and because, as described further below, the Governor and the Speaker make no argument that they can prevail on appeal if we conclude the estimate was inadequate -- this appeal necessarily turns on PROMESA's requirements for such estimates.

As discussed above, section 204(a)(2)(A) requires the Governor to provide "[a] formal estimate prepared by an appropriate

- 27 -

entity of the territorial government with expertise in budgets and financial management of the impact, if any, that the law will have on expenditures and revenues." 48 U.S.C. § 2144(a)(2)(A). In Pierluisi, our only previous case regarding the scope of this provision, we cited approvingly the district court's description "that a 'formal estimate' under section 204(a) means a complete and accurate estimate 'covering revenue and expenditure effects of new legislation' over the entire [five-year] period of the fiscal plan." 37 F.4th at 752 (quoting Fin. Oversight & Mgmt. Bd. for P.R. v. Garced (In re Fin. Oversight & Mgmt. Bd. for P.R.), 403 F. Supp. 3d 1, 13 (D.P.R. 2019)). We applied that standard to the estimates the Governor submitted for two different healthcare-related laws. Id. at 753, 762-64. For one of those laws, the Governor's submission reported an impact of $475,131.47 on the Department of Health's budget and no impact on revenues. Id. at 754. For the other, the submission simply stated the law would have no impact on expenditures or revenue. Id. at 753. Because the Governor provided no "analysis or data" to support these "conclusory" statements, we held that the Board had reasonably determined that the submissions failed to comply with section 204(a). Id. at 762-64.

Here, the Governor made no attempt to submit an estimate of Act 41's impact on government revenues, despite conceding that "Act 41 could have secondary effects that might affect employment

in the Commonwealth (thereby potentially affecting the tax base and revenues)." The only relevant financial figure included in the Section 204(a) Submission was an estimate of the Department of Labor's publishing costs. The Governor and the Speaker argue that no revenue estimate was required because Act 41 "regulates a purely private labor market, has no effect on tax rates, and creates no new sources of Government revenue." They assert that any impact on revenue would be speculative, maintaining that section 204(a) "does not require speculation about remote future fiscal effects."

But section 204(a)(2)(A) provides no exception for economic analysis that, as the Governor describes, is "difficult to perform" due to competing "macroeconomic factors." Doing what the Governor and the Speaker ask -- essentially, eliminating the formal estimate requirement for all private sector regulatory laws -- would be inconsistent with section 204(a)'s text and purpose. "The procedures and obligations contemplated by section 204(a) are not procedure for procedure's sake. Rather, they serve the critical purpose of allowing the Board to determine that the legislation at issue adheres to the fiscal plan and will not impair PROMESA's purpose of restoring Puerto Rico to fiscal stability." Pierluisi, 37 F.4th at 766. Requiring the Governor to formally estimate the fiscal impact of legislation also has the salutary effect of decreasing the likelihood that the Commonwealth will enact legislation that will prolong the Board's supervision,

or even worse, repeat the practices that led to the Commonwealth's insolvency. Accordingly, where it is clear that a law could have an impact on revenues -- as the Governor concedes here -- section 204(a)(2)(A) requires an estimate of such impact.

The Governor attempts to ground his interpretation of section 204(a)(2)(A) in its text, focusing on the following phrase: "estimate . . . of the impact, if any, that the law will have." 48 U.S.C. § 2144(a)(2)(A) (emphasis added). First, he asserts that "the plain meaning of 'will have' requires at a minimum that the future fiscal effects be reasonably foreseeable and estimable to be included in the § 204(a) estimate. Had Congress meant to require the Government to estimate speculative, secondary or tertiary effects of new legislation, it would have chosen 'could have,' 'may have,' or 'potentially have.'" Second, the "use of the words 'impact, if any,' reflects Congress's common sense understanding that there are some laws that will not have foreseeable (or even any) fiscal effects."

While we do not reject the possibility that some laws will indeed have no effect that can be estimated, the statute's use of the term "estimate" makes clear that uncertainty as to a law's effects does not generally provide an excuse for making no serious attempt. See The American Heritage Dictionary of the English Language 609 (5th ed. 2011) (defining the noun form of "estimate" as "[a] tentative evaluation or rough calculation, as

- 30 -

of worth, quantity or size"); Webster's New World College Dictionary 498 (5th ed. 2014) (defining the noun form of "estimate" as "a general calculation of size, value, etc."). Our conclusion is buttressed by the text's requirement that the estimate be "formal" -- signifying both the importance and the official nature of the estimate -- and by the requirement that the "formal estimate" be prepared by an "appropriate" entity with "expertise" in "budgets" and "financial management." See 48 U.S.C. § 2144(a)(2)(A). Although it may be "difficult" to foresee the revenue effects of Act 41 in light of competing economic factors, the Governor has failed to demonstrate that the effects of Act 41 are entirely unforeseeable or immeasurable through economic modeling.

Further, the Governor asserts that requiring an estimate that accounts for effects on the private labor market would go "beyond what the United States' Congressional Budget Office [(CBO)] is required to do." But he fails to address the fact that for certain "major legislation," the CBO is currently required to assess macroeconomic effects, such as effects on labor supply. See Megan S. Lynch & Jane G. Gravelle, Cong. Rsch. Serv., R46233, Dynamic Scoring in the Congressional Budget Process 4, 13 (2023). In any event, what the CBO is required to do sheds little light on what PROMESA mandates. CBO estimates are generally prepared for all bills reported from congressional committees, see id. at 2, so

- 31 -

it makes sense that more intensive modeling is not always required. Section 204(a), in contrast, kicks in only once a Commonwealth law is enacted. And, more importantly, CBO estimates are part of Congress's ongoing ordinary course of business, while section 204(a) was enacted in direct response to Puerto Rico's fiscal crisis and will no longer apply to Puerto Rico once the Board terminates.[6] Section 204(a) is thus a temporary measure addressing an acute need for detailed financial estimates, making comparisons to CBO estimates inapposite.

Additionally, the Governor argues that Act 41 is distinguishable from the healthcare laws at issue in Pierluisi. He asserts that those laws resulted in foreseeable government expenditures because they affected the prices health insurers would pay for medications and medical services, and such changes would affect the cost of government-provided health insurance. But the Board's requests for estimates for those laws were not limited solely to the impact on the government insurance plan. Pierluisi, 37 F.4th at 753. And even if the estimates relevant there had been so limited, it is not at all clear that estimating the effect on government insurance costs would have been much simpler than estimating Act 41's effects. The laws did not simply set new rate schedules; rather, one law created a new system for

_____

    [6] See supra note 4.

- 32 -

negotiating medication costs, and the other altered regulations regarding healthcare providers' relationships with managed care organizations and health insurance networks.  Id.

The Governor also points out that our decision in Pierluisi turned in part on our "conclusion that the Government had declined to supply requested information to the Board and then short-circuited the collaborative § 204(a) process by suing the Board for declaratory relief."  Here, the Governor asserts, "the Board stone-walled the Government and then abruptly terminated the § 204(a) process by suing."  While the Governor is correct that our reasoning in Pierluisi did, in part, turn on the Governor's decision to "cut off the exchange and [take] the Board to court," id. at 763, the Board's decision to file suit in this case occurred only after repeated requests for the relevant revenue estimate, and the Governor's erroneous insistence that no such estimate was required.

Finally, the Governor argues that the district court erred by failing to address whether the Board's actions with respect to Act 41 were arbitrary and capricious.  In the Governor's view, "the Board both pre-judged Act 41 and failed to provide the evidence and reasoning underlying the Board's rejection of the law."  The Governor relatedly contends that summary judgment was improper without first providing an adequate opportunity for discovery of certain Board materials, all of which pertain to the

Board's allegedly arbitrary and capricious actions.  But the Governor presents these alleged errors as stemming ultimately from the district court's "erroneous analysis" of the Section 204(a) Submission, and does not explain how this "arbitrary-and-capricious" argument could serve as an independent ground for reversal.  In any event, we find unpersuasive the contention that the Board need have done more to explain in its correspondence with the Governor the reasons why -- prior to the submission of the appropriate formal estimate -- the enforcement of Act 41 would "adversely affect the territorial government's compliance with the Fiscal Plan."  48 U.S.C. § 2144(a)(5).

In sum, all of the arguments that the Governor and the Speaker make on the merits hinge on the contention that section 204(a) requires no more of the Governor than what he did. Having rejected all permutations of that contention, we are left with no reason to disturb the district court's order nullifying Act 41.

**III.**

For the foregoing reasons, the judgment of the district court is <u>affirmed</u>.